**IN THE UNITED STATES DISTRICT COURT FOR THE
<u>EASTERN DISTRICT OF PENNSYLVANIA</u>**

| | | |
|---|---|---|
| **KYLE KUCHERA**<br>412 Esther Plz.<br>Princeton, New Jersey 08542 | : <br> : <br> : | |
| *Plaintiff* | : <br> : | |
| vs. | : <br> : | |
| **MICHAEL BURNS**<br>9 Skyview Drive<br>Ivyland, PA 18974 | : <br><br> : <br> : | |
| **NOAH HELD**<br>1112 N Hancock St<br>Philadelphia, PA 19123-1889 | : <br><br> : | **CASE No.** |
| *Defendants* | : <br> : | |
| And | : <br> : | |
| **MAVERN MARKETING, LLC**<br>Four Tower Bridge<br>200 Barr Harbor Drive<br>Conshohocken, PA 19428 | : <br><br><br> : <br> : | |
| **SIGNALTAP, LLC**<br>Four Tower Bridge<br>200 Barr Harbor Drive<br>Conshohocken, PA 19428 | : <br><br><br> : <br> : | |
| **REDSHIFT, LLC**<br>Four Tower Bridge<br>200 Barr Harbor Drive<br>Conshohocken, PA 19428 | : <br><br><br> : <br> : | |
| *Nominal Defendants* | : | |

---

**<u>COMPLAINT AND JURY TRIAL DEMAND</u>**

#494673v2

Plaintiff, Kyle Kuchera ("Plaintiff") by way of Complaint against the defendants Michael Burns and Noah Held (the "Defendants"), and Mavern Marketing, LLC SignalTap, LLC and Redshift, LLC (the "Nominal Defendants") says:

## PRELIMINARY STATEMENT

1.     At the root of this Complaint is the unlawful oppressive conduct on the part of the Defendants, who have unilaterally sought to extinguish Plaintiff Kyle Kuchera's ("Plaintiff" or "Kyle") one-third ownership interest in each of the Nominal Defendants, Mavern Marketing, LLC ("Mavern"), SignalTap, LLC, ("SignalTap") and Redshift, LLC ("Redshift").[1]

2.     The primary defendants are his co-owners Noah Held ("Held") a two time convicted felon with a violent history of assault, and Michael Burns ("Burns") the "President" of the Companies, who misappropriated at least $100,000 from the businesses over the past 12 months.  See e.g. Exhibit A.

3.     After being confronted with their lack of diligence, misappropriation of funds and fraud Held and Burns initiated a plan to "squeeze" out the Plaintiff from the companies he largely funded through his personal credit and business relationships.

4.     Specifically, Held and Burns – in direct violation of the governing Operating Agreements – engaged in the following actions to "freeze-out" Plaintiff from any meaningful participation in the Companies' business:

> (i)     they denied Plaintiff the right to any meaningful participation in the business.
>
> (ii)    repeatedly conducted meetings without notifying him or allowing him to participate.

---

[1] Mavern, SignalTap and Redshift shall collectively be referred to as the "Companies" or singularly as a "Company".

#494673v2

(iii)   refused to allow Plaintiff to meet with clients, prospective clients, vendors and advertisers  or to expend funds to develop business in direct violation of the Operating Agreements.

(iv)   terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

(v)   refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

(vi)   permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

(vii)   ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

(viii)   refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)   misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)   misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

5.   Prior to this lawsuit, the parties attempted to resolve the matter by "mediation" before the Hon. Mitchell Goldberg (ret.). Once the parties reached a tentative agreement, they were to begin the process of separating assets and information-which the Defendants fully understood.

6.   However, it became increasingly obvious the Defendants were having "buyer's remorse". First, they terminated Plaintiff based on a "claim" they had never submitted for consideration by the mediator. Second, out of the blue, they accused the Plaintiff of a myriad of unspecified "wrongful" acts and threatened litigation. When asked to detail exactly what he

allegedly did wrong – Plaintiff was met with silence. The bottom line is the entire claim was a

fabrication designed to allow the Defendants to "freeze" Plaintiff out of the Companies.

7.      As a result, Plaintiff seeks the following relief:

(i)    An order of Judicial dissolution for each Company pursuant to 15 Pa. S.C. §8871.

(ii)   A temporary, preliminary and permanent injunction against the Defendants and nominal Defendants from using the SignalTap technology, and the trade name SignalTap; and

(iii)  Other than in the ordinary course of business and as required by the Operating Agreement removing of dispersing any funds from the Companies whatsoever absent an express Order of this Court.

(iv)   Compelling the Defendants and Nominal Defendants to make a $20,000 distribution to the Plaintiff as required by the Operating Agreement.

(v)    Removing, copying, disclosing or damaging any electronically stored data or information confidential information or trade secrets of including but not limited to:

1.  information concerning one or more of the Companies' assets, database, operations, finances, employees, products and prospective products and technology including, without limitation, any and all technical and nontechnical information;

2.  patent, copyright, trade secret and proprietary information;

3.  ideas, schematics, concepts, work in process, technology, models, inventions, material data, business methods, business policies, research and/or development, drawings, know-how, processes, apparatus, equipment, algorithms, software programs, source code, object code, software source documents, and formulae related to the current, future and proposed products and services of the party;

4.  development, design details and specifications;

5.  financial information, customer and supplier lists;

6.  client information;

7.  pricing information; and

8.  business forecasts, sales and marketing plans.

9.  removing any assets, business information, confidential information or trade secrets, business records, financial information or other

#494673v2

business-related information from the Companies without express order and authorization of the Court.

10. terminating any material contract without the authorization of the Court.

11. interfering with or encouraging any vendor, service provider, consultant or contractor to terminate their association with the Companies,

(vi) actual, compensatory and punitive damages, attorney fees, and costs of suit.

## THE LITIGANTS

8. Plaintiff is a resident of the State of New Jersey, residing at 412 Esther Plz., Princeton, NJ 08542.

9. Defendant Burns is a resident of the Commonwealth of Pennsylvania, residing at 9 Skyview Drive, Ivyland, PA 18974.

10. Held is a resident of the Commonwealth of Pennsylvania, residing at 1112 N Hancock St., Philadelphia, PA 19123-1889.

11. Mavern is a limited liability Company organized under the laws of the Commonwealth of Pennsylvania with offices located at Four Tower Bridge 200 Barr Harbor Dr., Conshohocken, PA 19428.

12. SignalTap is a limited liability Company organized under the laws of the Commonwealth of Pennsylvania with offices located at Four Tower Bridge 200 Barr Harbor Dr., Conshohocken, PA 19428.

13. Redshift is a limited liability Company organized under the laws of the Commonwealth of Pennsylvania with offices located at Four Tower Bridge 200 Barr Harbor Dr., Conshohocken, PA 19428.

14. Each Company is owned one-third by Plaintiff and Defendants, who are residents of different states.

#494673v2

**JURISDICTION & VENUE**

15.     Pursuant to 28 U.S.C 1332 this Court has original jurisdiction as there is diversity of citizenship as the Plaintiff, Defendants and Nominal Defendants are resident of different states and the amount in controversy exceeds $75,000.

16.      Venue is appropriate as the Defendants are residents of this judicial district.

**FACTUAL BACKGROUND**

A.  Programmatic Advertising.

17.     Programmatic Advertising is the automated real-time buying and selling of digital space using AI and algorithms replacing manual negotiations with instant data-driven auctions. It enables advertisers to target specific audiences across websites, apps, and video, typically within milliseconds, increasing efficiency and return on investment.

18.     For instance, McDonalds is an advertiser. Previously, McDonalds would have to negotiate with each publisher (i.e. a website or a platform like Facebook) to exhibit McDonalds' advertisement. Now, McDonalds uses an automated process, within defined parameters to have its advertisement published on a site and presented to consumers across large advertising platforms.

19.     The "negotiation" happens in milliseconds through a series of "exchanges" designed to facilitate this process.  It is anticipated that more than $725 billion dollars will be expended on programmatic advertising in 2026.

20.     Unlike traditional advertising agencies:

- there are generally no long-term guaranteed contracts
- revenue is transactional and spend-driven
- campaigns can begin or stop at any time
- and success depends heavily on relationships, operational knowledge, and proprietary technology.

#494673v2

21.    The business operates through large advertising technology platforms, commonly referred to as a demand side platform ("DSP") and a supply side platform ("SSP"). A DSP is a tool that allows advertisers to buy digital and inventory across display, mobile, connected television ("CTV") and over-the-top ("OTT") marketing mediums. On the other hand, an SSP permits publishers to optimize the sale of their advertisement inventory across display, mobile and CTV.

B.  Plaintiff and Defendant's Background

(i)    Kyle's Background

22.    Kyle graduated from Cornell University with a degree in Engineering in Operations Research. Prior to entering the advertising technology industry, Kyle spent over a decade in institutional finance and investment management roles, including positions at:

- Morgan Stanley
- Perry Capital
- JANA Partners

23.    Kyle's responsibilities in those roles included quantitative analysis; financial modeling; portfolio management; trading and risk oversight; analytics platform development; operational automation; software/tooling development; and large-scale reporting systems.

24.    Kyle later transitioned into technology, analytics, and advertising technology leadership roles, including:

- President / Chief Revenue Officer at CrowdJoy
- Vice President of Product Development at ISM Connect
- VP Sales & Revenue Operations at Audigent
- Founder of LucidX (later Smart Supply) at AI Digital
- Founder/Principal of Mavern, SignalTap and Redshift

#494673v2

25.    At Audigent, Kyle led sales and revenue operations for the company's curated SmartPMP, ContextualPMP, and CognitivePMP offerings, generating more than $10 million in annual sales tied directly to programmatic curation and contextual targeting products.

26.    At AI Digital, Kyle founded and built LucidX (later renamed Smart Supply), a curated marketplace business centered around:

- SSP integrations
- PMP creation
- contextual targeting
- optimization workflows
- supply-path strategy
- agency and DSP relationships
- curated inventory packaging

27.    In its first year of operation, LucidX generated approximately:

- $15 million in managed media spend
- $4 million in revenue

28.    This substantially exceeded the business's original first-year revenue target of approximately $1.2 million, outperforming the target by roughly 233%.

29.    Finally, Kyle holds multiple industry and technical certifications, including:

- AWS Cloud Practitioner Certification
- Salesforce Certified Administrator
- The Trade Desk Edge Academy Certified
- The Trade Desk CTV Certification
- IAB Digital Media Sales Certification
- Python Programming Certification (PCEP)
- JavaScript Programming Certification (JSE)
- Flask / JavaScript / HTML coursework and certifications
- HubSpot Revenue Operations Certification

(ii)    <u>Burn's Background</u>

30.    Michael graduated with a History/Political Science degree from the University of Tampa. According to his Linked in page his employment history includes:

#494673v2

- Founder / CEO of Wedzee, a wedding-focused ecommerce marketplace startup (2018–2023), later acquired
- Business Development Manager at AdCellerant
- Marketing Consultant at Thrive Internet Marketing Agency
- Co-founder of Kadlee, an ecommerce bridal gift company
- Founder / CEO role at SignalTap / Mavern Media beginning in late 2022

31.     He holds certifications:

- Google Ads Search Certification
- Google Analytics Qualification

32.     However, none of the businesses Michael worked for prior to joining forces with Kyle had any meaningful operational presence in programmatic advertising.

(iii)    <u>Held's Background</u>

33.     Notwithstanding his felony background Noah earned a degree in Corporate Finance from Temple University. With Kyle's assistance, Noah was able to build a professional history which includes:

- Sales Assistant at Audigent (2022–2023)
- Associate – Growth at AI Digital / LucidX (2023–2024)
- Director of Business Development & Data Analytics at RedShift (2024)
- VP Operations / Co-Founder at SignalTap (2024–Present)

34.     Noah has never held a job that was not associated with Kyle's employment or influence due to his criminal history. Noah  holds certifications in Programmatic Advertising Foundations; and Bloomberg Market Concepts.

35.     On the personal side, Michael has been Kyle's closest friend since they were children, and Noah is Kyle's cousin. Neither had the background or experience to develop the Companies' business-but now apparently see an opportunity to force out Kyle for their own financial benefit.

#494673v2

C.      Mavern Marketing LLC and SignalTap

36.     On July 30, 2025 Plaintiff and Defendants (each being a "Member") organized 3 companies, Mavern, SignalTap and Redshift. See Exhibits B, C and D.

37.     Each Company and Member ratified an identical Operating Company. See Exhibits B, C and D.  Each Member was named a Manager, and their management authority was limited only by the written restrictions negotiated in paragraph 6.[2]

38.     The Operating Agreements in relevant parts provided as follows:

> 6(a) … Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provision of the Act, the Managers shall have full and complete authority, power, and discretion to direct, manage, and control the business, affairs, and properties of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the daily management of the Company's business, including but not limited to entering into contractual relationships on behalf of the Company up to $5,000.00 per commitment.
>
> 6(h)…The Managers shall perform their managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care and business judgment as an ordinarily prudent person in a like position would use under similar circumstances, including the reliance in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by the Managers, Members, officers, employees, or committees of the Company or by any other person, as to matters the Managers reasonably believe are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.
>
> 7.      Distributions. Distributions shall be made to the Members at the times and in the aggregate amounts as determined by the Members. The Members may first provide for any reserves that are deemed appropriate before allocating *distributions* to the Members. The Company will issue monthly distributions to Kyle Kuchera, Noah Held, and Michael Burns in the amount of $20,000.00 each, and *no actions shall be taken by the Company or the Members which will affect these monthly distribution amounts*. If there are insufficient funds on a monthly basis to issue such distributions, the Members agree to first meet in an effort to resolve the issue before any such amounts are adjusted.

39.     Pursuant to each Operating Agreement a Manager may only be removed for very limited and specific reasons. Section 6(L) provides as follows:

> Removal of Managers. Any Manager may be removed from office "For Cause" by a majority vote of the Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Manager engaging in any of the following: *fraud, embezzlement, or theft of Company property; willful misconduct resulting in*

---

[2]Burns and Held have decided that they have the right to limit Kyle's managerial authority, despite the fact that the agreement could only be amended by unanimous agreement. See Exhibit B, C & D par. 19.

*damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude.*

40.     In addition, Plaintiff could not be removed as  a "member" of any of the Companies as expressly stated at paragraph 15.

41.     Critically, it was recognized that Kyle was developing and owned critical intellectual property for each Company.  <u>See</u> Exhibits B, C and D par. 18. The software was repeatedly recognized as the "SignalTap" software.

42.     Finally, as set forth in Section 19each Operating Agreement could only be amended by unanimous consent *in writing*.

43.     As set forth in all three Operating Agreements Plaintiff was a founding member and equity holder of  each Company and has been the principal architect of its revenue model, product strategy, and demand-side relationships since inception.

44.     Kyle's professional experience at Audigent and AI Digital included generating in excess of $10 million annually in programmatic revenue and building a curated marketplace that achieved approximately $15 million in gross revenue in its first year. That experience directly informed the Company's strategic pivot from a traditional agency model to a scalable programmatic curation business.

45.     From mid-2023 forward, Kyle led the development of the Nominal Defendants programmatic advertising strategy, established and maintained key demand relationships, and assumed responsibility for building the Company's proprietary SignalTap platform when initial third-party development proved inadequate.

#494673v2

46.    The SignalTap intellectual property is now central to the Company's product offering and operational differentiation, supporting inventory ingestion, targeting, optimization, and reporting.[3]

47.    In addition, Plaintiff contributed to the Nominal Defendants,  his client contacts and information, The information and relationship he developed over the years constituted trade secret and confidential data.

48.    Specifically, during periods of litigation affecting the Nominal Defendants in 2023–2024, revenue continuity depended heavily on a limited set of algorithmic buyers, including Quantcast, RTB House, and Genius Sports, relationships that Kyle had developed prior to the company's formation and knew how to operationalize effectively. During this time, Kyle continued supporting the Company despite minimal compensation and significant personal financial strain.

49.    Plaintiff contributed the foregoing with the understanding that his employment was assured absent limited circumstances allowing for his termination under each Operating Agreements.  Specifically, the Operating Agreements only permitted a Manager to be terminated:

> Removal of Managers. Any Manager may be removed from office "For Cause" by a majority vote of the Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Manager engaging in any of the following: *fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude.* For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Manager in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". The removal of a Manager "For Cause" who is also a Member shall not automatically constitute the removal of the Member.

50.    Even if removed however, distributions in the amount of $20,000 were mandatory. As each Operating Agreement states:

---

[3] While Michael and Noah now downplay the importance of SignalTap,  they well recognized its importance in writing.

#494673v2

> <u>Distributions.</u> Distributions shall be made to the Members at the times and in the aggregate amounts as determined by the Members. The Members may first provide for any reserves that are deemed appropriate before allocating distributions to the Members. *The Company will issue monthly distributions to Kyle Kuchera, Noah Held, and Michael Burns in the amount of $20,000.00 each, and **no actions** shall be taken by the Company or the Members **which will affect these monthly distribution amounts**.* If there are insufficient funds on a monthly basis to issue such distributions, the Members agree to first meet in an effort to resolve the issue before any such amounts are adjusted.

Nothing in the Operating Agreement required a member to be an "employee" to receive such compensation.

51.     Finally, the Operating Agreements each contained an integration clause which provided as follows:

> This Operating Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior agreement or understanding among the parties hereto with respect to the subject matter hereof.

D.     <u>Corporate Disputes, Governance Breakdown & Financial Damages</u>

52.     Beginning in February 2025, disputes arose concerning managerial authority and the Company's operation in the ordinary course of business.

53.     On February 23, 2025, Kyle formally invoked the dispute resolution provisions of the Operating Agreement. Although a resolution was reached on March 5, 2025, including agreed-upon operational guidelines, those terms were never implemented.

54.     Instead, Defendants disrupted normal operations cancelled  meetings and made decisions without any input from Kyle-in order to squeeze him out with financial hardship directly attributed to their actions.

55.     Beginning around the third quarter of 2025, Burns and Held made a surreptitious internal decision to materially deprioritize the Companies' automated revenue business based on speculative claims that the business was "too risky."

#494673v2

56.     This decision was made without consultation with Kyle despite his operational and technology management role within the company. Kyle was not clearly informed of this shift until early 2026, by which point the business had already experienced severe deterioration and loss of income.

57.     Importantly, this automated business model was not experimental or novel. It was in fact, a core component of both Audigent's and AI Digital's operating model, where curated PMP deal creation, automated buyer relationships, and active optimization were central drivers of revenue generation. The underlying buyer relationships and platform connections supporting this revenue stream were largely developed and brought into Mavern by Kuchera.

58.     This business model was not passive. It required continuous management and active cultivation to sustain revenue, including:

- Creation of new PMP deals tied to seasonal and advertiser demand
- Ongoing optimization and pruning of underperforming deals
- Active communication with SSPs and DSP buyers
- Regular engagement with platform representatives
- Expansion and refreshing of deal libraries
- Continuous adaptation to changing algorithmic buying behavior

59.     Instead, in breach of the Operating Agreement Burns and Held materially reduced or abandoned many of these activities. An analysis of the available financial information depicts the damages caused by the bad-faith conduct:

**Automated Revenue by Quarter**

#494673v2

| Period | Revenue |
|---|---|
| Q1  2024 | $185,572 |
| Q2  2024 | $247,495 |
| Q3  2024 | $269,719 |
| Q4  2024 | $336,147 |
| Q1 2025 | $342,991 |
| Q2  2025 | $230,858 |
| Q3  2025 | $218,366 |
| Q4  2025 | $138,452 |
| Q1 2026 | $86,498 |

60.     Had Burns and Held not taken such action this line of business alone could have approached $1,000,000 per year in annual income.

61.     Compounding the above, were the Defendants repeated interference with Kyle's sales efforts for almost a year, in violation of the Operating Agreement.

62.     The Defendants unilaterally cancelling meetings, client conferences, industry conference and the like have led to losses of at least $200,000 annually based on an analysis of past performance.

63.     In fact, in the months preceding his termination Plaintiff was directed to cancel or avoid more than *20 sales meetings and client calls* (including AdForm, Assembly, Essence, New Media Firm and many others) and at least *3 major industry* conferences, including Digiday, POSSIBLE, and America Votes Summit.

#494673v2

64.    In this industry, those are core revenue-generating activities rather than discretionary networking events. And the cancellations orchestrated by Defendants have therefore damaged the Nominal Defendants. And it was made clear that absent his compliance Plaintiff would be fired. Absurdly Defendants compared these conferences to "bar association events and conferences". There is no such comparison as the purposes of these conferences was to meet clients-not mingle among colleagues.

65.    Each action taken by the Defendants violated every key term of the Operating Agreements. Combining the above with Burn's habit of paying his personal expenses at somewhere currently between $3,000 and $4,000 per month (without the benefit of an audit) leaves the business struggling financially.

66.    In closing, since last year, Held and Burns, acting in coordination, have recharacterized routine revenue-generating activities as requiring prior approval, restricted partner and client engagement, and centralized operational control in direct breach of the Operating Agreement. The Company has declined to retain independent corporate counsel while individual members retained personal counsel, further exacerbating governance ambiguity. These actions materially impaired the Company's ability to operate in the ordinary course and generate revenue. In the event litigation is necessary, damages will be readily established.

E.    Defendants Breach the Operating Agreements By Wrongfully Terminating Plaintiff and Failing to Pay Him His Monthly Distribution

67.    On or about May 20, 2026 the Defendants voted to terminate the Plaintiffs employment because he claimed ownership of the tradename SignaTap.  No such dispute had been submitted to mediation as required by the Operating Agreement prior to the vote.

68.    The SinalTap technology and tradename were by contract, Plaintiffs property as expressly stated in each Operating Agreement. In fact, Plaintiff:

#494673v2

- conceived, designed, and directed development of the platform.

- The technology grew directly out of the work Plaintiff performed at Audigent and AI Digital, including LucidX/Smart Supply and the curation, optimization, SSP/DSP integration, and workflow methodologies I developed there.

- Throughout the companies' existence, everyone referred to the software as the "SignalTap" platform or "SignalTap software."

- The Operating Agreements expressly recognize that Plaintiff was developing intellectual property for the companies.

- Plaintiff personally built or directed development of the AWS infrastructure, application architecture, optimization engine, reporting workflows, and related technology.

69.    Worse yet the tradename was the name attributed to the software Plaintiff owned and was being developed for the business.  Thus, he had a legitimate claim thereto.

70.    Nonetheless, the convicted felon (Held) and corporate thief (Burns) made the decision to terminate Plaintiff's employment-even though the basis for termination it never met the standard for termination as detailed in the Operating Agreement.

71.    Then, Held and Burns terminated distributions to the Plaintiff despite the express language of the Operating Agreements.

**COUNT I**
**Breach of Contract**
(Burns, Held & Mavern)

72.     Plaintiff repeats the allegations of paragraphs 1-71 as if set forth herein at length.

73.    Plaintiff entered into an Operating Agreement with the Defendants which set forth the terms of their relationship in Mavern.

74.    The Operating Agreement set forth the managerial authority granted the Plaintiff, his rights as a Manager and Member and the limited basis upon which he could be terminated.

75.    Moreover, the contract expressly provided Plaintiff was to receive $20,000 per month -*distribution-no matter what action had been taken*.

#494673v2

76.     There was no requirement Plaintiff be employed to receive his monthly distribution.

77.     In addition, the Defendants further agreed to an integration clause and that no amendment or modification of the document would occur absent Plaintiff's express written consent.

78.     As such, the parties were bound to perform the terms thereof, absent Plaintiff's consent.

79.     As detailed above, Defendants have intentionally, maliciously and in bad faith breached the foregoing terms of foregoing Operating Agreement.

**Wherefore**, Plaintiff demands Judgment finding that the Defendants and Mavern breached the terms of the Operating Agreement by among other things wrongfully terminating his status as a Manager and awarding him damages, attorneys' fees; cost of suit; and such other relief as the Court deems just and proper.

## COUNT II
**Breach of Contract**
(Burns, Held & SignalTap)

80.     Plaintiff repeats the allegations of paragraphs 1-79 as if set forth herein at length.

81.     Plaintiff entered into an Operating Agreement with the Defendants which set forth the terms of their relationship in SignalTap.

82.     The Operating Agreement set forth the managerial authority granted the Plaintiff, his rights as a Manager and Member and the limited basis upon which he could be terminated.

83.     Moreover, the contract expressly provided Plaintiff was to receive $20,000 per month -*distribution-no matter what action had been taken*.

84.     There was no requirement Plaintiff be employed to receive his monthly distribution.

#494673v2

85. In addition, the Defendants further agreed to an integration clause and that no amendment or modification of the document would occur absent Plaintiff's express written consent.

86. As such, the parties were bound to perform the terms thereof, absent Plaintiff's consent.

87. As detailed above, Defendants have intentionally, maliciously and in bad faith breached the foregoing terms of foregoing Operating Agreement.

**Wherefore**, Plaintiff demands Judgment against the Defendants and finding that the Defendants and SignalTap breached the terms of the Operating Agreement by among other things wrongfully terminating his status as a Manager and awarding him damages, attorneys' fees; cost of suit; and such other relief as the Court deems just and proper.

<u>COUNT III</u>
**Breach of Contract**
(Burns, Held, Redshift)

88. Plaintiff repeats the allegations of paragraphs 1-87 as if set forth herein at length.

89. Plaintiff entered into an Operating Agreement with the Defendants which set forth the terms of their relationship in Redshift.

90. The Operating Agreement set forth the managerial authority granted the Plaintiff, his rights as a Manager and Member and the limited basis upon which he could be terminated.

91. Moreover, the contract expressly provided Plaintiff was to receive $20,000 per month -*distribution-no matter what action had been taken*.

92. There was no requirement Plaintiff be employed to receive his monthly distribution.

93. In addition, the Defendants further agreed to an integration clause and that no

#494673v2

amendment or modification of the document would occur absent Plaintiff's express written consent. As such, the parties were bound to perform the terms thereof, absent Plaintiff's consent.

94.     As detailed above, Defendants have intentionally, maliciously and in bad faith breached the foregoing terms of foregoing Operating Agreement.

**Wherefore**, Plaintiff demands Judgment against the Defendants ns; and finding that the Defendants and Redshift breached the terms of the Operating Agreement by among other things wrongfully terminating his status as a Manager and awarding him damages, attorneys' fees; cost of suit; and such other relief as the Court deems just and proper.

**COUNT IV**
**Declaratory Judgment Act**

95.     Plaintiff repeats the allegations in the preceding paragraphs 1-94 as if set forth herein at length.

96.     The purpose of the Pennsylvania Declaratory Judgment Act is to "settle and to afford relief from uncertainty and insecurity with respect to rights, status, and under legal relations". 42 Pa.C.S. § 7541(a).

97.     As a result, "the Declaratory Judgment Act" is to be liberally construed and administered.  42 Pa.C.S. § 7541(a).

98.     An action brought under the Declaratory Judgment Act "must allege an interest by the party seeking relief, which is direct, substantial, and present…and must demonstrate the existence of an actual controversy related to the invasion or threatening invasion of one's legal rights."  *Bowen v. Mount Joy Twp.*, 644 A.2d 818, 821 (Pa. Cmwlth. 1994) (quoting *Pa. Institutional Health Servs., Inc. v. Dep't. of Corr.*, 631 A.2d 767, 771 (Pa. Cmwlth.) *aff'd*, 640 A.2d. 413 (Pa. 1994)), *appeal denied*, 652 A.2d 1326 (Pa. 1994).

99.     Each Operating Agreement required that Plaintiff receive the sum of $20,000 per

#494673v2

month as a distribution-notwithstanding any action taken.

100.    The Defendants have failed and refused to make the foregoing payment despite the express language of each Operating Agreement, claiming this Plaintiff's termination justifies the termination of the distribution.

101.    Plaintiff therefore requests that the Defendants interpretation breaches the plain language of the Operating Agreement.

**Wherefore**, Plaintiff requests that the Court enter a Declaratory Judgment (i) finding that termination of $20,000 per month distribution per each Operating Agreement is mandatory and may not be terminated by the Defendants and awarding the same retroactive to June 2026 and ordering Defendants and the Nominal Defendants continue to make such payments going forward, and further awarding Plaintiff damages, actual and punitive, for attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

## COUNT VI
### Breach of Fiduciary Duty-Mavern
(Duty of Loyalty—Burns and Held)

102.    Plaintiff incorporates by reference the allegations of paragraphs 1-101 as if set forth herein at length.

103.    Pursuant to the Pa. LLC Act (15 Pa.C.S.A § 8849), a managing member owes the members of a limited liability company a fiduciary duty.

104.    The fiduciary duty of loyalty includes the duty to account the company and its members for the property, profits, or benefits derived therefrom, and to refrain from misappropriating the same for the manager's own benefit.

105.    In addition, a managing member must refrain from competing or acting in an adverse manner to the company or the member's interest.

#494673v2

105.   The Defendants have breached their statutory duties by failing and refusing to abide by the terms of the Operating Agreement by including but not limited to:

(i)   refusing to make distributions as required thereunder.

(ii)   repeatedly conducted meetings without notifying him or allowing him to participate.

(iii)   refused to allow Plaintiff to meet with clients, prospective clients or to expend funds to develop business in direct violation of the Operating Agreements.

(iv)   terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

(v)   refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

(vi)   permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

(vii)   ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

(viii)   refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)   misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)   misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

106.   The actions undertaken by Burns and Held  were self-dealing actions, designed solely to advance their personal interests to the determinant of Kyle  .

107.   In fact, Burns and Held  have usurped available business opportunities for their own

#494673v2

economic benefit and to the exclusion of Kyle, despite the express terms of the Operating Agreement.

108.    As a consequence, the Defendants' actions and omissions have damaged Kyle .

**Wherefore**, Plaintiff demands judgment against the Defendants Burns and Held  for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

**<u>COUNT VII</u>**
**Breach of Fiduciary Duty-SignalTap**
(Duty of Loyalty—Burns and Held)

109.    Plaintiff incorporates by reference the allegations of paragraphs 1-108 as if set forth herein at length.

110.    Pursuant to the Pa. LLC Act (15 Pa.C.S.A § 8849), a managing member owes the members of a limited liability company a fiduciary duty.

111.    The fiduciary duty of loyalty includes the duty to account the company and its members for the property, profits, or benefits derived therefrom, and to refrain from misappropriating the same for the manager's own benefit.

112.    In addition, a managing member must refrain from competing or acting in an adverse manner to the company or the member's interest.

113.    The Defendants have breached their statutory duties by failing and refusing to abide by the terms of the Operating Agreement by including but not limited to:

(i)    refusing to make distributions as required thereunder.

(ii)    repeatedly conducted meetings without notifying him or allowing him to participate.

(iii)    refused to allow Plaintiff to meet with clients, prospective clients or to expend funds to develop business in direct violation of the Operating Agreements.

#494673v2

(iv)    terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

(v)    refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

(vi)    permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

(vii)    ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

(viii)    refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)    misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)    misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

114.    The actions undertaken by Burns and Held  were self-dealing actions, designed solely to advance their personal interests to the determinant of Kyle.

115.    In fact, Burns and Held  have usurped available business opportunities for their own economic benefit and to the exclusion of Kyle, despite the express terms of the Operating Agreement.

116.    As a consequence, the Defendants' actions and omissions have damaged Kyle.

**Wherefore**, Plaintiff demands judgment against the Defendants Burns and Held   for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

**COUNT VIII**
**Breach of Fiduciary Duty-Redshift**
(Duty of Loyalty—Burns and Held)

117.    Plaintiff incorporates by reference the allegations of paragraphs 1-116 as if set forth herein at length.

118.    Pursuant to the Pa. LLC Act (15 Pa.C.S.A § 8849), a managing member owes the members of a limited liability company a fiduciary duty.

119.    The fiduciary duty of loyalty includes the duty to account the company and its members for the property, profits, or benefits derived therefrom, and to refrain from misappropriating the same for the manager's own benefit.

120.    In addition, a managing member must refrain from competing or acting in an adverse manner to the company or the member's interest.

121.    The Defendants have breached their statutory duties by failing and refusing to abide by the terms of the Operating Agreement by including but not limited to:

(i)    refusing to make distributions as required thereunder.

(ii)    repeatedly conducted meetings without notifying him or allowing him to participate.

(iii)    refused to allow Plaintiff to meet with clients, prospective clients or to expend funds to develop business in direct violation of the Operating Agreements.

(iv)    terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

(v)    refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

#494673v2

(vi)    permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

(vii)    ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

(viii)    refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)    misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)    misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

122.    The actions undertaken by Burns and Held  were self-dealing actions, designed solely to advance their personal interests to the determinant of Kyle.

123.    In fact, Burns and Held  have usurped available business opportunities for their own economic benefit and to the exclusion of Kyle, despite the express terms of the Operating Agreement.

124.    As a consequence, the Defendants' actions and omissions have damaged Kyle.

**Wherefore**, Plaintiff demands judgment against the Defendants Burns and Held  for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

## COUNT IX
### Breach of Duty of Care-Mavern
(Burns and Held **)**

125.    Plaintiff incorporates by reference the allegations of paragraphs 1-125 as if set forth

#494673v2

herein at length.

126.    Pursuant to the Pa. LLC Act, managing members owe a member of a limited liability company a duty of care.  This statutory mandate requires that a managing member:

> Refrain from engaging in gross negligence, recklessness, willful misconduct, or a knowing violation of law.

127.    In direct violation of the foregoing, Burns and Held  have acted in a negligent, reckless, and acted willfully in violation of governing law.

128.    Specifically, the two individual Defendants have breached and acted to interfere with Kyle 's rights under the terms of the Mavern Operating Agreement.

129.    Moreover, the Mavern Operating Agreement expressly provided that Burns and Held  were prohibited from:

   (i)    refusing to make distributions as required thereunder.

   (ii)   repeatedly conducted meetings without notifying him or allowing him to participate.

   (iii)  refused to allow Plaintiff to meet with clients, prospective clients or to expend funds to develop business in direct violation of the Operating Agreements.

   (iv)   terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

   (v)    refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

   (vi)   permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

   (vii)  ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

#494673v2

(viii)    refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)    misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)    misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

130.    Burns and Held deliberately breached the duty of care, as they have misappropriated for themselves the SignalTap trade name, intellectual property, assets, customers, business, confidential data and their own benefit.

131.    Because of the Defendants' actions, Kyle has been damaged.

**Wherefore**, Plaintiff demands judgment against Defendants Burns and Held  for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

<u>**COUNT X**</u>
**Breach of Duty of Care-SignalTap**
(Burns and Held )

132.    Plaintiff incorporates by reference the allegations of paragraphs 1-132 as if set forth herein at length.

133.    Pursuant to the Pa. LLC Act, managing members owe a member of a limited liability company a duty of care.  This statutory mandate requires that a managing member:

Refrain from engaging in gross negligence, recklessness, willful misconduct, or a knowing violation of law.

134.    In direct violation of the foregoing, Burns and Held  have acted in a negligent, reckless, and acted willfully in violation of governing law.

#494673v2

135.   Specifically, the two individual Defendants have breached and acted to interfere with Kyle 's rights under the terms of the SignalTap Operating Agreement.

136.   Moreover, the SignalTap Operating Agreement expressly provided that Burns and Held  were prohibited from:

(i)   refusing to make distributions as required thereunder.

(ii)   repeatedly conducted meetings without notifying him or allowing him to participate.

(iii)   refused to allow Plaintiff to meet with clients, prospective clients or to expend funds to develop business in direct violation of the Operating Agreements.

(iv)   terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

(v)   refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

(vi)   permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

(vii)   ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

(viii)   refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)   misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)   misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

#494673v2

137.    Burns and Held deliberately breached the duty of care, as they have misappropriated for themselves the SignalTap trade name, intellectual property, assets, customers, business, confidential data and their own benefit.

138.    Because of the Defendants' actions, Kyle  has been damaged.

**Wherefore**, Plaintiff demands judgment against Defendants Burns and Held  for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

### COUNT XI
**Breach of Duty of Care-Redshift**
(Burns and Held )

139.    Plaintiff incorporates by reference the allegations of paragraphs 1-139 as if set forth herein at length.

140.    Pursuant to the Pa. LLC Act, managing members owe a member of a limited liability company a duty of care.  This statutory mandate requires that a managing member:

> Refrain from engaging in gross negligence, recklessness, willful misconduct, or a knowing violation of law.

141    In direct violation of the foregoing, Burns and Held have acted in a negligent, reckless, and acted willfully in violation of governing law.

142.    Specifically, the two individual Defendants have breached and acted to interfere with Kyle 's rights under the terms of the SignalTap Operating Agreement.

143.    Moreover, the SignalTap Operating Agreement expressly provided that Burns and Held  were prohibited from:

> (i)    refusing to make distributions as required thereunder.

> (ii)    repeatedly conducted meetings without notifying him or allowing him to participate.

#494673v2

(iii)   refused to allow Plaintiff to meet with clients, prospective clients or to expend funds to develop business in direct violation of the Operating Agreements.

(iv)   terminated the Plaintiff's employment based on a claim that did not meet the contractual mandates set forth in the Operating Agreements; and without first pursuing the claims in mediation.

(v)   refused to pay for legitimate corporate expenses, incurred in the ordinary course of business.

(vi)   permitted Burns to (i) take $75,000 from the Company, which he refused to repay; (ii) pay $2,000 per month for health insurance which was not provided to the other members; and (iii) take a $500 a month allowance for a health club membership, which was not authorized by the members.

(vii)   ran up debt on credit cards that Plaintiff personally guaranteed, which they have failed to satisfy.

(viii)   refused to compensate Plaintiff for intellectual property he developed and the Companies deployed, referred to as the SignalTap technology-despite the express terms of an Operating Agreement.

(ix)   misappropriated Plaintiff's intellectual property, including the trade name SignalTap for their own use.

(x)   misappropriated Plaintiff's client contact and relationships as if their own. As detailed below neither Defendant has any independent background or client relationships other than what was developed in association with the Plaintiff. In fact, Held only has a career because the Plaintiff-his cousin-used his relationships to afford him a career opportunity.

144.   Burns and Held deliberately breached the duty of care, as they have misappropriated for themselves the SignalTap trade name, intellectual property, assets, customers, business, confidential data and their own benefit.

145.   Because of the Defendants' actions, Kyle has been damaged.

**Wherefore**, Plaintiff demands judgment against Defendants Burns and Held for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

#494673v2

## COUNT XII
### Breach of Covenant of Good Faith and Fair Dealing
(Burns and Held -Mavern)

146. Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-145 as if set forth herein at length.

147. Pursuant to the Pa. LLC Act, a member shall discharge their duties and obligations under this title or under the Mavern Operating Agreement and any rights consistent therewith in "good faith".

148. Burns and Held breached the covenant of good faith by and through their conduct as detailed and described above.

149. As a result thereof Plaintiff has been damaged.

**Wherefore**, Plaintiff demands judgment against Defendants Burns and Held for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

## COUNT XIII
### Breach of Covenant of Good Faith and Fair Dealing
(Burns and Held-SignalTap)

150. Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-149 as if set forth herein at length.

151. Pursuant to the Pa. LLC Act, a member shall discharge their duties and obligations under this title or under the SignalTap Operating Agreement and any rights consistent therewith in "good faith".

152. Burns and Held breached the covenant of good faith by and through their conduct as detailed and described above

153. As a result, Plaintiff has been damaged.

#494673v2

**Wherefore**, Plaintiff demands judgment against Defendants Burns and Held  for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

## COUNT XIV
### Breach of Implied Covenant of Good Faith and Fair Dealing
(Burns and Held -Redshift)

154.    Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-153 as if set forth herein at length.

155.    Pursuant to the Pa. LLC Act, a member shall discharge their duties and obligations under this title or under the SignalTap Operating Agreement and any rights consistent therewith in "good faith".

156.    Burns and Held  breached the covenant of good faith by and through their conduct as detailed and described above.

157.    As a result, Plaintiff has been damaged.

**Wherefore**, Plaintiff demands judgment against Defendants Burns and Held  for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

## COUNT XVI
### Appointment of Special Fiscal Agent
For Mavern, SignalTap and Redshift

158.    Plaintiff incorporates by reference the allegations of the preceding paragraphs 1-157 as if set forth herein at length.

159.    The Court in *Manufacturers & Traders Trust Co. v. Minuteman Spill Response, Inc.*, 999 F. Supp. 2d 805, 816 (W.D. Pa. 2013), highlighted nine equitable factors, compiled from the case law of multiple circuits, which a district court may consider to determine whether it is

#494673v2

appropriate to appoint a receiver. (citing *Comerica Bank v. State Petroleum Distributors, Inc.*, Civ. No. 3:08-678, 2008 WL 2550553, at *4 (M.D. Pa. June 2, 2008). These nine factors are the:

> (1)    Probability of the plaintiff's success in the action.
>
> (2)    Possibility of irreparable injury to the plaintiff's interests in the property.
>
> (3)    Inadequacy of the security to satisfy the debt.
>
> (4)    Probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim.
>
> (5)    Financial position of the debtor.
>
> (6)    Imminent danger of the property being lost, concealed, injured, diminished in value, or squandered.
>
> (7)    Inadequacy of available legal remedies.
>
> (8)    Lack of a less drastic equitable remedy; and
>
> (9)    Likelihood that appointing a receiver will do more harm than good.

160.    Where the record shows that the court's intervention is necessary to protect a plaintiff's equitable interests during the pendency of a litigation, some courts opt to appoint a special fiscal agent, rather than a receiver, because a special fiscal agent is a "less dramatic" and "less intrusive device" than a receiver. *Leone Indus. v. Assoc. Packaging, Inc.,* 795 F. Supp. 117, 120 (D.N.J. 1992); *see also In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 560 (D.N.J. 1997) *aff'd. in part*, 148 F.3d 283 (3d Cir. 1998). It is preferable to appoint a special fiscal agent in those circumstances where the plaintiffs' needs would be sufficiently protected by either remedy. *See In re Prudential,* 962 F. Supp. at 560*; Leone,* 795 F. Supp. at 120.

161.    Fiscal agents are generally appointed to monitor corporate record keeping or to prevent the erosion of assets on behalf of shareholders or other plaintiffs. *See, e.g., In re Prudential Ins. Co. of Am. Sales Practices Litig.,* 962 F. Supp. 450, 560 (D.N.J. 1997), *aff'd. in part*, 148 F.3d

#494673v2

283 (3d Cir. 1998).

162.    As detailed above, the Defendants have breached every core provision of the Mavern, SignalTap and Redshift Operating Agreements, governing law and covenant of good faith.

163.    Moreover, neither Defendant is trustworthy.  Held has a long history of violent robberies and assault, while Burns has taken funds without authority; and refused to return funds to the company-that according to the Defendants were desperately needed.

164.    Based on the foregoing, Kyle has demonstrated the:

    (1)    Probability of the plaintiff's success in the action.

    (2)    Possibility of irreparable injury to the plaintiff's interests in the property.

    (3)    Probability that fraudulent conduct has occurred or will occur to frustrate the plaintiff's claim.

    (4)    Imminent danger of the property being lost, concealed, injured, diminished in value, or squandered.

    (5)    Inadequacy of available legal remedies.

    (6)    Lack of a less drastic equitable remedy; and

    (7)    Likelihood that appointing a receiver will do more harm than good.

165.    Where the record shows that the court's intervention is necessary to protect a plaintiff's equitable interests during the pendency of a litigation, some courts opt to appoint a special fiscal agent, rather than a receiver, because a special fiscal agent is a "less dramatic" and "less intrusive device" than a receiver.

166.    Kyle   has established each of the foregoing elements and thus either a receiver or special fiscal agent must be appointed by the Court.

#494673v2

**Wherefore**, Plaintiff demands judgment against the Defendants and requests the appointment of a Receiver or Special Fiscal Agent for each of the Nominal Defendants; as well as damages, punitive damages, attorneys' fees, costs of suit and such other relief as the Court deems just and proper.

### COUNT XVII
### (Conspiracy)

167.    Plaintiff repeats the allegations in the preceding paragraphs 1-166 as if set forth herein at length.

168.    In order to state a civil action for conspiracy, plaintiff must allege the following: (1) a combination of two or more persons acting with a common purpose to do an unlawful act or to do a lawful act by unlawful means or for an unlawful purpose; (2) an overt act done in pursuance of the common purpose and (3) actual legal damage. *McKeeman v. Corestates Bank, N.A.,* 751 A.2d 655, 660 (Pa.Super.Ct. 2000)(citations omitted).

169.    Further, "absent a civil cause of action for a particular act, there can be no cause of action for civil conspiracy to commit that act." *Id.* (citing *Pelagatti v. Cohen*, 370 Pa.Super. 422, 431, 536 A.2d 1337, 1342 (1987)).

170.    In addition, "[p]roof of malice, i.e., an intent to injure, is essential in proof of a conspiracy." *Skipworth by Williams v. Lead Indus. Ass'n*, 547 Pa. 224, 235, 690 A.2d 169, 174 (1997)(citing *Thompson Coal Co. v. Pike Coal Co.*, 488 Pa. 198, 211, 412 A.2d 466, 472 (1979)).

171.    However, plaintiff need not aver specifically the time, place or date for a conspiratorial meeting or the precise date on which the conspiracy was entered. *Smith v. Wagner,* 403 Pa. Super. 316, 324, 588 A.2d 1308, 1312 (1991)(quoting *P.L.E. Conspiracy* § 26).

172.    As detailed above, Burns and Held  engaged in a series of unlawful acts to squeeze out Kyle from Mavern, SignalTap and Mavern for the express common purposes of

#494673v2

misappropriating his ownership interest and the profit due him for their own use and purposes.

173. Burns and Held 's actions include but were not limited to breaching the terms of the Mavern, SignalTap and Redshift Operating Agreements, violating their duty of care and loyalty, wrongfully terminating the Plaintiff and misappropriating funds.

174. Burns and Held 's actions were part of a well-orchestrated fraud, and their overt actions were designed to defeat the express terms of the Operating Agreements.

175. As a consequence, Kyle has been damaged.

**Wherefore**, Plaintiff demands judgment against the Defendants for damages, punitive damages, attorneys' fees, cost of suit, and such other relief as the Court deems just and proper.

## COUNT XVIII
### (Equitable and Injunctive Relief)

176. Plaintiff repeats the allegations in the preceding paragraphs 1-176 as if set forth herein at length.

177. Kyle is entitled to the issuance of a preliminary and permanent injunction as detailed below.

178. Burns and Held have breached their contractual, fiduciary and statutory duties, and, as a result, caused Kyle to suffer irreparable harm.

179. Burns and Held have been consistently inequitable, unfair, and oppressive. They have engaged in self-dealing conduct and otherwise refused to act consistent with their duties as the managing members as well as breached the terms of the Operating Agreements.

**Wherefore,** Plaintiff requests, pending the termination of this proceeding, an injunction, enjoining the Defendants from:

1. Removing, copying, disclosing or damaging any electronically stored data or information ("ESI") confidential information or trade secrets of including but not limited to:

#494673v2

(a)     information concerning the company's assets, database, operations, finances, employees, products and prospective products and technology including, without limitation, any and all technical and non-technical information;

(b)     copyright, trade secret and proprietary information;

(c)     ideas, schematics, concepts, work in process, technology, models, inventions, material data, business methods, business policies, research and/or development, drawings, know-how, processes, apparatus, equipment, algorithms, software programs, source code, object code, software source documents, and formulae related to the current, future and proposed products and services of the party.

(d)     financial information, customer and supplier lists,

(e)     client information,

(f)     pricing information,

(g)     business forecasts, sales and marketing plans.

2.    Removing any assets, business information, confidential information or trade secrets, business records, financial information or other business-related information from the companies without express order and authorization of the Court or the custodian appointed herein.

3.    Terminating any material contract without the authorization of the Court or the special fiscal agent.

4.    Interfering with or encouraging any employee or prospective employee, vendor, service provider, consultant or contractor to terminate their association with the companies.

5     Organizing any further companies until final disposition of this lawsuit.

6.    Violating their non-compete agreements further.

7.    Using company funds to defend this action.

#494673v2

## JURY TRIAL DEMAND

Plaintiff demands a jury trial on non-equity issues.

Respectfully submitted,

**Lauletta Birnbaum, LLC**

*Thomas S. Harty, Esq.*
Thomas S. Harty, Esquire

Attorney for Plaintiff

#494673v2

# Exhibit A



**Times Leader**
DIGITAL ARCHIVE

Printed

July 7, 2026

# State police arrest two men accused of robbing gas stations

By **Times Leader**

November 12, 2016



HAZLETON — State police have arrested two men that allegedly robbed gas stations earlier this week.

Noah Michael Held, 20, of Hazleton, and Gordon Joseph Barlow III, 24, of Weston, are accused of robbing a Sunoco in Dorrance Township on Thursday. Held is also accused of robbing the Valero gas station on Route 309 in Hazle Township on Friday.

The police report did not provide any other information on the alleged robberies.

In regard to the alleged Sunoco robbery, Held is charged with robbery, theft, receiving stolen property and simple assault, and Barlow is charged with receiving stolen property. They were arraigned on their charges before Magisterial District Judge Thomas Mallow, and are scheduled for preliminary hearings on Nov. 23 before Magisterial District Judge Ronald Swank. Held's bail was set at $25,000, and Barlow's was set at $5,000.

For the alleged Valery robbery, Held is charged with criminal attempt to commit robbery and simple assault. He was arraigned on those charges before Malloy, and a hearing is set for those charges before Magisterial District Judge James Dixon on Nov. 23. Malloy set Held's bail on those charges at $10,000.

Both Held and Barlow are jailed at the Luzerne County Correctional Facility for lack of bail.

timesleader.com                    https://archive.timesleader.com/article/606119/state-police-arrest-two-men-accused-of-robbing-gas-stations

# Exhibit B

# MAVERN MARKETING LLC

*A Pennsylvania Limited Liability Company*

LLC Operating Agreement

**LIMITED LIABILITY COMPANY
OPERATING AGREEMENT OF
MAVERN MARKETING LLC**

This Limited Liability Company Operating Agreement (this "Operating Agreement") of **Mavern Marketing LLC**, a Pennsylvania limited liability company (the "Company"), is entered into as of ⎽J⎽v⎽l⎽y⎽ ⎽3⎽0⎽ , 2025, by and among the Company and the signatories hereto (and such other persons who shall be admitted in the future as members of the Company in accordance with the terms hereof and shall have agreed to be bound hereby), each being sometimes referred to individually as a "Member" and collectively as the "Members."

W I T N E S S E T H:

WHEREAS, the Company was formed upon the filing of the Certificate of Organization (the "Certificate") with the Department of State of the Commonwealth of Pennsylvania on June 22, 2023; and

WHEREAS, the Members (defined below) wish to enter into this Operating Agreement to set forth their rights, obligations, and duties with respect to the Company.

NOW, THEREFORE, the Members hereby form a limited liability company pursuant to and in accordance with the Pennsylvania Limited Liability Company Law of 2016, as amended from time to time (the "Act"), and hereby agrees as follows:

1.    Name.  The name of the limited liability company formed hereby is:

**Mavern Marketing LLC**

2.    Term.  The term of the Company shall be perpetual unless dissolved in accordance with the Act.

3.    Purpose. The primary purpose of the Company is to provide marketing services. Notwithstanding the foregoing, the Company may carry on any lawful business, purpose, or activity for which limited liability companies may be organized under the Act. The Company shall at all times: (A) maintain its own separate books, records, and bank accounts; (B) hold itself out to the public and all other persons as a legal entity separate from its Members and any other person; (C) not commingle its assets with assets of any other person; (D) conduct its business in its own name and strictly comply with all organizational formalities to maintain its separate existence; (E) maintain separate financial statements; (F) pay its own liabilities only out of its own funds; (G) maintain an arm's length relationship with its affiliates and its Members; (H) pay the salaries of its own employees, if any; (I) not hold out its credit or assets as being available to satisfy the obligations of others; (J) allocate fairly and reasonably any overhead for shared office space; (K) use separate stationery, invoices, and checks; (L) not pledge its assets for the benefit of any other Person; (M) correct any known misunderstanding regarding its separate identity; (N)

- 1 -

maintain adequate capital in light of its contemplated business purpose, transactions, and liabilities; and (O) file its own tax returns, if any, and pay any taxes so required to be paid under applicable law to the extent that it is not (1) part of a consolidated group filing a consolidated return or returns, or (2) treated as a division or disregarded entity for tax purposes of another taxpayer; provided, however, that the failure of the Company, or the Members on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Operating Agreement shall not affect the status of the Company as a separate legal entity. As used in this Operating Agreement, "Person" shall mean any real person or organized entity.

4.    Members.

a.    Members. The Company initially shall have one class of membership interest in the form of voting common units ("Units"). A person acquiring an ownership interest in the Company shall become a Member and be issued Units. Each Member's ownership Percentage Interest is the ratio of such Member's Units to all outstanding Units ("Percentage Interest"). A Person shall become a Member and be issued Units upon payment to the Company of any required capital contribution, which shall have appurtenant to it the right to one vote per Unit whenever Members are entitled to vote under the terms of this Operating Agreement. Unless otherwise stated, all Company decisions and resolutions require a majority vote of the interests of the Members. Upon execution of this Operating Agreement, each Member shall make the contribution set forth opposite such Member's name on Schedule A and shall receive the number of Units set forth thereon. Schedule A, as updated from time to time, shall be the complete record of Unit issuances in lieu of certificates and all Members are deemed to have been issued the Units identified on Schedule A. Presently, the Company has three Members, and the names and addresses of such Members are as follows:

| Name | Address |
|------|---------|
| Kyle Kuchera | 1919 Market St #2602 Philadelphia, PA 19103 |
| Noah Held | 1112 North Hancock St #4331 Philadelphia, PA 19123 |
| Michael Burns | 9 Skyview Drive Ivyland, PA 18974 |

5.    Office. The registered office of the Company shall be United States Corporation Agents, Inc., in Lehigh County. The Company may establish other places of business of the Company when and where required by or advisable to conduct the Company's business.

6.    Management.

a.    Management of the Company Generally. The business and affairs of the Company shall be managed by one or more managers ("Managers"). Unless authorized to do so

- 2 -

by this Operating Agreement or by Members, no attorney-in-fact, Member, employee, officer, or agent of the Company, other than the Members or a Manager, shall have any power or authority to bind the Company in any way, to pledge its credit, or to render it liable pecuniarily for any purpose. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provision of the Act, the Managers shall have full and complete authority, power, and discretion to direct, manage, and control the business, affairs, and properties of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the daily management of the Company's business, including but not limited to entering into contractual relationships on behalf of the Company up to $5,000.00 per commitment.

      b.     Qualifications. Each Manager of the Company shall be a natural person of full age who need not be a resident of the Commonwealth of Pennsylvania.

      c.     Number, Selection, and Term of Office.

      (1)     Managers shall be appointed from time to time by the Members. Initially, the Managers shall be Kyle Kuchera, Noah Held, and Michael Burns. There is no maximum on the number of Managers the Company may have. Kyle Kuchera shall be primarily responsible for sales and technology responsibilities, Noah will shall be primarily responsible for sales and operations responsibilities, and Michael Burns shall be primarily responsible for marketing and finance responsibilities.

      (2)     Each Manager shall hold office until a successor has been selected and qualified by the Members or until his or her earlier death, resignation in accordance with 6(k) of this Operating Agreement, or removal by the Members in accordance with 6(l) of this Operating Agreement.

      d.     Managers' Meetings. Meetings of the Managers shall be held at such time and place within or outside of the Commonwealth of Pennsylvania as shall be designated from time to time by resolution of the Managers.

      e.     Manner of Acting. Whenever any Company action is to be taken by a vote of the Managers of the Company, it shall be authorized upon receiving the concurrence of any one Manager. Any action of the Managers which may be taken at a meeting of the Managers may be taken by written consent upon the execution of such consent by any one Manager, acting singly. Where a vote has been taken by the Managers, in the case that multiple Managers exist and the Members are not the Managers, whenever there is a tie vote, the Members shall cast the determinative vote. If the Members are the Managers, the Members may unilaterally authorize any actions of the Company.

      f.     Limitation of Managers' Authority.

- 3 -

(1)     Notwithstanding the powers and authorities described in Section 6(a) above, unless prior written approval has been given by the Members, the Managers shall not be authorized:

(i)     To sign contracts or enter into agreements on behalf of the Company in excess of $5,000.00;

(ii)     To apply for loans on behalf of the Company in excess of $5,000.00;

(iii)     To employ accountants, legal counsel, managing agents, or other experts or consultants to perform services for the Company or to compensate them from Company funds in excess of $5,000.00;

(iv)     To purchase, hold, sell, exchange, transfer, or otherwise acquire or dispose of real or personal property, whether tangible or intangible, held by the Company in excess of $5,000.00;

(v)     To open and close bank accounts on behalf of the Company;

(vi)     To make withdrawals from Company funds;

(vii)     To terminate contracts between the Company and customers, clients, vendors, or any other party in agreement with the Company;

(viii)     To purchase liability or other insurance on behalf of the Company's property or business in excess of $5,000.00;

(ix)     To execute on behalf of the Company any other instruments or documents, including checks, drafts, notes, or other negotiable instruments; mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage, or disposition of the Company's property; assignments, bills of sale, leases, partnership agreements; or operating agreements of other limited liability companies in excess of $5,000.00; or

(x)     To dissolve the Company except as otherwise provided in Section 17 below.

- 4 -

g.  Reliance by Third Parties.  Persons dealing with the Company are entitled to rely conclusively upon a certificate of the Managers to the effect that they are then acting as the Managers and upon the power of the Managers as herein set forth.

h.  Liability for Certain Acts.  The Managers shall perform their managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care and business judgment as an ordinarily prudent person in a like position would use under similar circumstances, including the reliance in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by the Managers, Members, officers, employees, or committees of the Company or by any other person, as to matters the Managers reasonably believe are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company.  The Managers do not, in any way, guarantee the return of the Members' capital contributions or a profit for the Members from the operations of the Company.  The Managers who so perform the duties of the Managers shall not be personally liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless (i) the Manager has breached or failed to perform the duties of its position under the Act or this Operating Agreement; and (ii) the breach or failure to perform constitutes self-dealing, willful misconduct, or recklessness by the Manager.  Nothing in this paragraph shall apply to the liability of a Manager pursuant to any criminal statute, or for the payment of taxes pursuant to federal, state, or local law.

i.  Reliance on Reports and Information by Member or Manager.  A Member or Manager of the Company shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other person, as to matters the Member or Manager reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

j.  Bank Accounts.  Unless requested in writing by the Members, the Managers shall not be authorized to open bank accounts in the name of the Company.  The Members shall be the sole signatories on any bank accounts opened in the name of the Company.

k.  Resignation.  A Manager of the Company may resign at any time by giving written notice to the Company.  The resignation of a Manager shall be effective upon receipt of such notice or at such later time as shall be specified in the notice.  Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make such resignation effective.  The resignation of a Manager who is also a Member shall not automatically constitute the withdrawal of the Manager's rights as a Member.

- 5 -

l.     Removal of Managers. Any Manager may be removed from office "For Cause" by a majority vote of the Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Manager engaging in any of the following: fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude. For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Manager in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". The removal of a Manager "For Cause" who is also a Member shall not automatically constitute the removal of the Member.

m.     Vacancies. In the event of any vacancy with respect to a Manager occurring for any reason, the Members shall appoint an interim Manager until the vacancy is filled.

n.     Compensation. Without the approval of the Members, the Managers will not be entitled to compensation for their services as Managers. The Company shall, however, reimburse the Managers for their reasonable expenses incurred in connection with their services to the Company.

7.     Capital Contributions. The Members have contributed to the Company an amount of money and the fair market value of property as their initial capital contributions, in exchange for which they have each received 333.33 Units, representing a 33.33% Percentage Interest each in the Company.

8.     Additional Contributions. Members shall not be required to make additional capital contributions to the Company.

9.     Allocation of Profits and Losses. The Company's profits and losses shall be allocated first to restore any net loss of the Company, and then to the Members in accordance with the Members' Percentage Interests. The Members intend that the Company be disregarded as an entity separate from its owners for U.S. tax purposes.

10.     Distributions. Distributions shall be made to the Members at the times and in the aggregate amounts as determined by the Members. The Members may first provide for any reserves that are deemed appropriate before allocating distributions to the Members. The Company will issue monthly distributions to Kyle Kuchera, Noah Held, and Michael Burns in the amount of $20,000.00 each, and no actions shall be taken by the Company or the Members which will affect these monthly distribution amounts. If there are insufficient funds on a monthly basis to issue such distributions, the Members agree to first meet in an effort to resolve the issue before any such amounts are adjusted.

11.     Best Efforts. Each Member shall have the devote their time and best efforts as reasonably necessary to fulfill their respective duties to the Company, and perform such duties in

- 6 -

good faith. The Members acknowledge and agree that continued failure to exercise such duties and devote such time without such failure being cured within thirty (30) days of notice of such may constitute grounds for removal of a Member, consistent with the terms of this Operating Agreement.

      12.   Transfers.

      a.   Right of First Refusal. If at any time any of the Members (for purposes of this paragraph "Selling Member") desires to sell to a third party ("Buyer") some or all of the Units ("Offered Units") of such Selling Member, such Selling Member shall obtain from such Buyer a bona fide written offer ("Offer") which the Selling Member is ready and willing to accept in good faith, to purchase the Offered Units and shall give notice in writing to all other Members of the receipt of the Offer together with a copy thereof, and the other Members (for purposes of this paragraph the "Offeree Members") shall have the right, exercisable by written notice given to the Selling Member within sixty (60) days after the giving of the notice by the Selling Member, to purchase, at a price equal to the Offer price, any or all of the Offered Units. The right of any Offeree Member to purchase the Offered Units shall be in proportion to its holdings of all Units held by all Offeree Members, provided that Offeree Members may oversubscribe for Offered Units and shall be entitled to acquire additional Offered Units, in proportion to their holdings of all Units held by all other oversubscribing Members, to the extent that Offered Units remain unallocated after all Offeree Members have responded to, or have been deemed to waive, the Offer. If the Offeree Members exercise such rights in whole or part, the purchase and sale of the Offered Units taken up by the Offeree Members shall be completed within thirty (30) days of the date on which the Offeree Members give notice to the Selling Member of their intention to exercise this right. If the Offeree Members do not exercise such right in respect of all of the Offered Units, then the Selling Member may accept the Offer and some or all of the remaining unsubscribed Offered Units in accordance with the provisions of the Offer during the further period of thirty (30) days after the expiration of the period of thirty (30) days during which the Offeree Members could have exercised this right. If no such sale is completed within such further period of thirty (30) days, the provisions of this paragraph shall again apply to any proposed sale of Units and so on from time to time.

      b.   Drag-Along Rights. If any third party who deals at arm's length with all Members (the "Offeror") has made an offer, proposed to be completed by way of asset or Unit acquisition, takeover bid, merger, amalgamation, statutory arrangement or any other business combination, that would result in a change of control of the Company or a transfer of all or substantially all of its assets with an offer price of at least $30,000,000.00 (a "Substantial Offer"), and Members holding a majority of the outstanding Units of the Company ("Accepting Members") have notified the other Members in writing that they will accept the Substantial Offer, then after compliance with Section 12a., Right of First Refusal, the Accepting Members may (but are not required to) give notice (the "Selling Notice") signed by all Accepting Members of such acceptance and the exercise of their rights hereunder to the Company and to each of the other Members and shall set out in the Selling Notice the name of the Offeror and the terms of the Substantial Offer. Following receipt of the Selling Notice, each Member shall be required to transfer all of its Units to the Offeror pursuant to the terms of the Substantial Offer and/or to vote or cause to be voted all of its Units to accomplish and give effect to the

- 7 -

terms and conditions of the Substantial Offer in accordance with such Selling Notice, provided that the time specified for such transfer shall be at least sixty (60) days after the Selling Notice is given, and upon such terms as are contained in the Substantial Offer. Each Member hereby irrevocably appoints the Accepting Members as their lawful attorneys and agents, which appointment is coupled with an interest, with full power and authority to execute for and in the name of and on behalf of the Member any deeds, transfers, conveyances, assignments, assurances, certificates and other documents and to do all things and acts which the Member is required to do hereunder in connection with a sale of the Units pursuant to this paragraph.

13.    Withdrawal of a Member.    Any Member may withdraw from the Company in accordance with the Act and upon approval of the other Members. Upon such withdrawal, the Member shall be entitled to receive the fair market valuation of their Percentage Interest at the time of such withdrawal, as determined by an independent third-party valuation paid for by the Company. This buyout amount shall be paid from the Company to the withdrawing Member over an agreed-upon period of time not to exceed five (5) years from the date of withdrawal. Separately, the death of a Member shall cause the Member's Percentage Interest in the Company to terminate (subject to the terms herein), and the proceeds from the Company's life insurance policy on such deceased Member will be used to buyout the deceased Member's Percentage Interest at the then-current fair market value. The deceased Member's estate shall receive such payout amount and retain a non-voting economic-only interest in future liquidation events of the Company in an amount to be determined by the remaining Members.

14.    Admission of Additional Members.    One or more additional members of the Company may be admitted to the Company from time to time by the unanimous consent of the Members.

15.    Member Removal.    Except for Kyle Kuchera, Noah Held, and Michael Burns, any future Member may be removed as a Member of the Company "For Cause" by a majority vote of the interests of the remaining Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Member engaging in any of the following: fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude. For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Member in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". Upon removal, the removed Member's interest in the Company shall be partially bought out, with the remaining Members having sole discretion over the valuation and payment terms. Additionally, the removed Member shall retain a non-voting equity interest of approximately five to ten percent in the Company (5-10%) (as determined by the Company at the time of removal), which shall entitle the removed Member to benefits from any future liquidity events of the Company.

16.    Indemnification.

- 8 -

a.    Indemnification Generally. The Company shall indemnify, save harmless, and pay all judgments and claims against any Member, Manager, or employee ("Company Representative") relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Company Representative in connection with the Company's business, provided that the Company Representative has given the Company written notification of the claim within ten (10) days of either service of process upon the Company Representative or the Company Representative's actual or constructive notice of the claim. Upon receipt of the Company Representative's written notification of the claim, the Company shall provide legal representation for the Company Representative in connection with the defense of any action based on any such act or omission. Notwithstanding any provision of this Operating Agreement, the Company will not indemnify, or the pay the expenses (including attorney's fees) of, any Company Representative:

(1)    In a suit or claim brought by the Company Representative, unless such person has acted in good faith and in a manner which he or she reasonably believed to be in, or not opposed to, the best interests of the Company;

(2)    In the case of a criminal proceeding, unless such Company Representative had no reasonable cause to believe that the conduct at issue was unlawful; or

(3)    To the extent that an Indemnified Representative of the Company has been successful on the merits or otherwise in defense of any proceeding or in defense of any claim, issue, or matter therein, such person shall be indemnified against expenses (including attorneys' fees and disbursements) actually and reasonably incurred by such person in connection therewith.

b.    Liability to the Company. No Company Representative shall be liable, in damages or otherwise, to the Company or to any Member for any loss or liability that arises out of any act performed or omitted to be performed by such Company Representative pursuant to the authority granted by this Operating Agreement, other than any loss or liability that results from acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law.

c.    Contribution.    If the indemnification provided for in this Section or otherwise is unavailable for any reason in respect of any liability or portion thereof, the Company shall contribute to the liabilities to which the indemnified person may be subject in such proportion as is appropriate to reflect the intent of this Section or otherwise.

d.  Scope of this Section. The rights granted by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification, contribution, or advancement of expenses may be entitled under any statute, agreement, or otherwise, both as to action in an indemnified capacity and as to action in any other capacity. The indemnification, contribution, and advancement of expenses provided by or granted pursuant to this Section shall continue as to a Person who has ceased to be a Company Representative in respect of matters arising prior to

such time, and shall inure to the benefit of the heirs, executors, administrators, and personal representatives of such a Person.

17.    Dissolution.  The Company shall be dissolved upon the unanimous written consent of the Members that it is no longer in the best interests of the Company to continue the business of the Company, or upon the entry of an order of judicial dissolution under the Act.  In the event of dissolution, the Members shall wind up the business of the Company in the following order of priority: (i) for payment of the Company's liabilities and obligations to its creditors (including creditors who are also Members), and the expenses of such dissolution, (ii) to the setting up of any reserves that the Members may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, and (iii) to the Members on a pro rata basis.

18.    Intellectual Property and Proprietary Rights.  Except for intellectual property that Kyle Kuchera is independently developing for the Company as of the date of this Operating Agreement (which he shall retain full rights to unless a separate agreement is entered into between Kyle Kuchera and the Company regarding such ownership), all intellectual property, proprietary information, and materials created by the Members for the Company and in connection with the Company shall belong to and be owned by the Company. The Members hereby assign and any all rights to such intellectual property to the Company perpetually, and agree that they will engage in good faith negotiations with respect to the future ownership of intellectual property being developed by Kyle Kuchera as of the date of this Operating Agreement (for which he may be granted an additional Percentage Interest in the Company not to exceed an additional 5%).

19.    Amendments.  This Operating Agreement may be amended from time to time by the unanimous written consent of the Members.

20.    Entire Agreement.  This Operating Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior agreement or understanding among the parties hereto with respect to the subject matter hereof.

21.    Governing Law and Dispute Resolution.  This Operating Agreement shall be governed by, and construed under, the laws of the Commonwealth of Pennsylvania, all rights and remedies being governed by said laws. In the event of any dispute arising under this Operating Agreement, any such dispute which cannot be resolved directly among the Members within thirty (30) days shall be submitted to binding mediation, to be conducted by an independently appointed mediator. In this scenario, each Member agrees that it waives all claims it has or may have in civil court relating to such dispute, and agrees that the decision of the mediator would be in full settlement of such claims.

*[signature page follows]*

- 10 -

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Operating Agreement as of the date first written above.

Kyle Kuchera, Member

Kyle Kuchera

Noah Held, Member

Noah Held

Michael Burns, Member

Michael Burns

- 11 -

**MAVERN MARKETING LLC**

**COUNTERPART SIGNATURE PAGE**
**TO OPERATING AGREEMENT**

_____, 20__

      The undersigned, desiring to become a member as of the date set forth above of MAVERN MARKETING LLC, a Pennsylvania limited liability company (the "Company"), hereby adopt and agree to be bound by all of the terms and provisions of, and shall be entitled to all of the benefits and privileges of, the Operating Agreement among the Company and the members of the Company (the "Operating Agreement"), and further authorize the Company to attach this signature page to the Operating Agreement in order to make the undersigned a party to the Operating Agreement.

_____

Name:
Address:

_____
_____
_____

Acknowledged and Agreed as of
_____ ____, 20____

MAVERN MARKETING LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

- 12 -

**SCHEDULE A**

Units

| MEMBER NAME | NUMBER OF UNITS | PERCENTAGE INTEREST |
|---|---|---|
| Kyle Kuchera | 333.33 | 33.33% |
| Noah Held | 333.33 | 33.33% |
| Michael Burns | 333.33 | 33.33% |
| | | |
| | | |

*The contribution amount reflects the sum of all expenditures made by and the fair market value of property of the Members prior to the Company's formal organization in connection with establishing the Company and acquiring the assets necessary to operate the Company.

Note: Schedule A, as updated from time to time, shall be the complete record of Unit issuances and Percentage Interests, and all Members are deemed to have been issued the Units and Percentage Interests identified on Schedule A.

- 13 -

# Exhibit C

# SIGNALTAP LLC

*A New Mexico Limited Liability Company*

LLC Operating Agreement

**LIMITED LIABILITY COMPANY**
**OPERATING AGREEMENT OF**
**SIGNALTAP LLC**

This Limited Liability Company Operating Agreement (this "Operating Agreement") of **SignalTap LLC**, a New Mexico limited liability company (the "Company"), is entered into as of ⟨July 30⟩, 2025, by and among the Company and the signatories hereto (and such other persons who shall be admitted in the future as members of the Company in accordance with the terms hereof and shall have agreed to be bound hereby), each being sometimes referred to individually as a "Member" and collectively as the "Members."

WITNESSETH:

WHEREAS, the Company was formed upon the filing of a Certificate of Organization (the "Certificate") with the New Mexico Secretary of State on April 15, 2024; and

WHEREAS, the Members (defined below) wish to enter into this Operating Agreement to set forth their rights, obligations, and duties with respect to the Company.

NOW, THEREFORE, the Members hereby form a limited liability company pursuant to and in accordance with the New Mexico Limited Liability Company Act, as amended from time to time (the "Act"), and hereby agrees as follows:

1.    Name.  The name of the limited liability company formed hereby is:

**SignalTap LLC**

2.    Term.  The term of the Company shall be perpetual unless dissolved in accordance with the Act.

3.    Purpose.  The primary purpose of the Company is to provide marketing services. Notwithstanding the foregoing, the Company may carry on any lawful business, purpose, or activity for which limited liability companies may be organized under the Act. The Company shall at all times: (A) maintain its own separate books, records, and bank accounts; (B) hold itself out to the public and all other persons as a legal entity separate from its Members and any other person; (C) not commingle its assets with assets of any other person; (D) conduct its business in its own name and strictly comply with all organizational formalities to maintain its separate existence; (E) maintain separate financial statements; (F) pay its own liabilities only out of its own funds; (G) maintain an arm's length relationship with its affiliates and its Members; (H) pay the salaries of its own employees, if any; (I) not hold out its credit or assets as being available to satisfy the obligations of others; (J) allocate fairly and reasonably any overhead for shared office space; (K) use separate stationery, invoices, and checks; (L) not pledge its assets for the benefit of any other Person; (M) correct any known misunderstanding regarding its separate identity; (N) maintain adequate capital in light of its contemplated business purpose, transactions, and

- 1 -

liabilities; and (O) file its own tax returns, if any, and pay any taxes so required to be paid under applicable law to the extent that it is not (1) part of a consolidated group filing a consolidated return or returns, or (2) treated as a division or disregarded entity for tax purposes of another taxpayer; provided, however, that the failure of the Company, or the Members on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Operating Agreement shall not affect the status of the Company as a separate legal entity. As used in this Operating Agreement, "Person" shall mean any real person or organized entity.

4. Members.

a. Members. The Company initially shall have one class of membership interest in the form of voting common units ("Units"). A person acquiring an ownership interest in the Company shall become a Member and be issued Units. Each Member's ownership Percentage Interest is the ratio of such Member's Units to all outstanding Units ("Percentage Interest"). A Person shall become a Member and be issued Units upon payment to the Company of any required capital contribution, which shall have appurtenant to it the right to one vote per Unit whenever Members are entitled to vote under the terms of this Operating Agreement. Unless otherwise stated, all Company decisions and resolutions require a majority vote of the interests of the Members. Upon execution of this Operating Agreement, each Member shall make the contribution set forth opposite such Member's name on Schedule A and shall receive the number of Units set forth thereon. Schedule A, as updated from time to time, shall be the complete record of Unit issuances in lieu of certificates and all Members are deemed to have been issued the Units identified on Schedule A. Presently, the Company has three Members, and the names and addresses of such Members are as follows:

| Name | Address |
|---|---|
| Kyle Kuchera | 1919 Market St #2602 Philadelphia, PA 19103 |
| Noah Held | 112 North Hancock St #H331 Philadelphia, PA 19123 |
| Michael Burns | 9 Skyview Drive Ivyland, PA 18974 |

5. Office. The registered office of the Company shall be 4801 Lang Avenue NE, Suite 110, Alburquerque, New Mexico. The Company may establish other places of business of the Company when and where required by or advisable to conduct the Company's business.

6. Management.

a. Management of the Company Generally. The business and affairs of the Company shall be managed by one or more managers ("Managers"). Unless authorized to do so by this Operating Agreement or by Members, no attorney-in-fact, Member, employee, officer, or

- 2 -

agent of the Company, other than the Members or a Manager, shall have any power or authority to bind the Company in any way, to pledge its credit, or to render it liable pecuniarily for any purpose. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provision of the Act, the Managers shall have full and complete authority, power, and discretion to direct, manage, and control the business, affairs, and properties of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the daily management of the Company's business, including but not limited to entering into contractual relationships on behalf of the Company up to $5,000.00 per commitment.

        b.    Qualifications. Each Manager of the Company shall be a natural person of full age who need not be a resident of the State of New Mexico.

        c.    Number, Selection, and Term of Office.

        (1)    Managers shall be appointed from time to time by the Members. Initially, the Managers shall be Kyle Kuchera, Noah Held, and Michael Burns. There is no maximum on the number of Managers the Company may have. Kyle Kuchera shall be primarily responsible for sales and technology responsibilities, Noah will shall be primarily responsible for sales and operations responsibilities, and Michael Burns shall be primarily responsible for marketing and finance responsibilities.

        (2)    Each Manager shall hold office until a successor has been selected and qualified by the Members or until his or her earlier death, resignation in accordance with 6(k) of this Operating Agreement, or removal by the Members in accordance with 6(l) of this Operating Agreement.

        d.    Managers' Meetings. Meetings of the Managers shall be held at such time and place within or outside of the State of New Mexico as shall be designated from time to time by resolution of the Managers.

        e.    Manner of Acting. Whenever any Company action is to be taken by a vote of the Managers of the Company, it shall be authorized upon receiving the concurrence of any one Manager. Any action of the Managers which may be taken at a meeting of the Managers may be taken by written consent upon the execution of such consent by any one Manager, acting singly. Where a vote has been taken by the Managers, in the case that multiple Managers exist and the Members are not the Managers, whenever there is a tie vote, the Members shall cast the determinative vote. If the Members are the Managers, the Members may unilaterally authorize any actions of the Company.

        f.    Limitation of Managers' Authority.

        (1)    Notwithstanding the powers and authorities described in Section 6(a) above, unless prior written approval has been given by the Members, the Managers shall not be authorized:

(i)     To sign contracts or enter into agreements on behalf of the Company in excess of $5,000.00;

(ii)    To apply for loans on behalf of the Company in excess of $5,000.00;

(iii)  To employ accountants, legal counsel, managing agents, or other experts or consultants to perform services for the Company or to compensate them from Company funds in excess of $5,000.00;

(iv)    To purchase, hold, sell, exchange, transfer, or otherwise acquire or dispose of real or personal property, whether tangible or intangible, held by the Company in excess of $5,000.00;

(v)     To open and close bank accounts on behalf of the Company;

(vi)    To make withdrawals from Company funds;

(vii)   To terminate contracts between the Company and customers, clients, vendors, or any other party in agreement with the Company;

(viii)  To purchase liability or other insurance on behalf of the Company's property or business in excess of $5,000.00;

(ix)    To execute on behalf of the Company any other instruments or documents, including checks, drafts, notes, or other negotiable instruments; mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage, or disposition of the Company's property; assignments, bills of sale, leases, partnership agreements; or operating agreements of other limited liability companies in excess of $5,000.00; or

(x)     To dissolve the Company except as otherwise provided in Section 17 below.

      g.     <u>Reliance by Third Parties</u>. Persons dealing with the Company are entitled to rely conclusively upon a certificate of the Managers to the effect that they are then acting as the Managers and upon the power of the Managers as herein set forth.

- 4 -

h.    Liability for Certain Acts. The Managers shall perform their managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care and business judgment as an ordinarily prudent person in a like position would use under similar circumstances, including the reliance in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by the Managers, Members, officers, employees, or committees of the Company or by any other person, as to matters the Managers reasonably believe are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. The Managers do not, in any way, guarantee the return of the Members' capital contributions or a profit for the Members from the operations of the Company. The Managers who so perform the duties of the Managers shall not be personally liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless (i) the Manager has breached or failed to perform the duties of its position under the Act or this Operating Agreement; and (ii) the breach or failure to perform constitutes self-dealing, willful misconduct, or recklessness by the Manager. Nothing in this paragraph shall apply to the liability of a Manager pursuant to any criminal statute, or for the payment of taxes pursuant to federal, state, or local law.

i.    Reliance on Reports and Information by Member or Manager. A Member or Manager of the Company shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other person, as to matters the Member or Manager reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

j.    Bank Accounts. Unless requested in writing by the Members, the Managers shall not be authorized to open bank accounts in the name of the Company. The Members shall be the sole signatories on any bank accounts opened in the name of the Company.

k.    Resignation. A Manager of the Company may resign at any time by giving written notice to the Company. The resignation of a Manager shall be effective upon receipt of such notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make such resignation effective. The resignation of a Manager who is also a Member shall not automatically constitute the withdrawal of the Manager's rights as a Member.

l.    Removal of Managers. Any Manager may be removed from office "For Cause" by a majority vote of the Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Manager engaging in any of the following: fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential

- 5 -

information; or being charged with a felony or a misdemeanor involving moral turpitude. For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Manager in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". The removal of a Manager "For Cause" who is also a Member shall not automatically constitute the removal of the Member.

m.    Vacancies. In the event of any vacancy with respect to a Manager occurring for any reason, the Members shall appoint an interim Manager until the vacancy is filled.

n.    Compensation. Without the approval of the Members, the Managers will not be entitled to compensation for their services as Managers. The Company shall, however, reimburse the Managers for their reasonable expenses incurred in connection with their services to the Company.

7.    Capital Contributions. The Members have contributed to the Company an amount of money and the fair market value of property as their initial capital contributions, in exchange for which they have each received 333.33 Units, representing a 33.33% Percentage Interest each in the Company.

8.    Additional Contributions. Members shall not be required to make additional capital contributions to the Company.

9.    Allocation of Profits and Losses. The Company's profits and losses shall be allocated first to restore any net loss of the Company, and then to the Members in accordance with the Members' Percentage Interests. The Members intend that the Company be disregarded as an entity separate from its owners for U.S. tax purposes.

10.    Distributions. Distributions shall be made to the Members at the times and in the aggregate amounts as determined by the Members. The Members may first provide for any reserves that are deemed appropriate before allocating distributions to the Members. The Company will issue monthly distributions to Kyle Kuchera, Noah Held, and Michael Burns in the amount of $20,000.00 each, and no actions shall be taken by the Company or the Members which will affect these monthly distribution amounts. If there are insufficient funds on a monthly basis to issue such distributions, the Members agree to first meet in an effort to resolve the issue before any such amounts are adjusted.

11.    Best Efforts. Each Member shall have the devote their time and best efforts as reasonably necessary to fulfill their respective duties to the Company, and perform such duties in good faith. The Members acknowledge and agree that continued failure to exercise such duties and devote such time without such failure being cured within thirty (30) days of notice of such may constitute grounds for removal of a Member, consistent with the terms of this Operating Agreement.

- 6 -

12. <u>Transfers</u>.

a.    <u>Right of First Refusal</u>. If at any time any of the Members (for purposes of this paragraph "<u>Selling Member</u>") desires to sell to a third party ("<u>Buyer</u>") some or all of the Units ("<u>Offered Units</u>") of such Selling Member, such Selling Member shall obtain from such Buyer a bona fide written offer ("<u>Offer</u>") which the Selling Member is ready and willing to accept in good faith, to purchase the Offered Units and shall give notice in writing to all other Members of the receipt of the Offer together with a copy thereof, and the other Members (for purposes of this paragraph the "<u>Offeree Members</u>") shall have the right, exercisable by written notice given to the Selling Member within sixty (60) days after the giving of the notice by the Selling Member, to purchase, at a price equal to the Offer price, any or all of the Offered Units. The right of any Offeree Member to purchase the Offered Units shall be in proportion to its holdings of all Units held by all Offeree Members, provided that Offeree Members may oversubscribe for Offered Units and shall be entitled to acquire additional Offered Units, in proportion to their holdings of all Units held by all other oversubscribing Members, to the extent that Offered Units remain unallocated after all Offeree Members have responded to, or have been deemed to waive, the Offer. If the Offeree Members exercise such rights in whole or part, the purchase and sale of the Offered Units taken up by the Offeree Members shall be completed within thirty (30) days of the date on which the Offeree Members give notice to the Selling Member of their intention to exercise this right. If the Offeree Members do not exercise such right in respect of all of the Offered Units, then the Selling Member may accept the Offer and some or all of the remaining unsubscribed Offered Units in accordance with the provisions of the Offer during the further period of thirty (30) days after the expiration of the period of thirty (30) days during which the Offeree Members could have exercised this right. If no such sale is completed within such further period of thirty (30) days, the provisions of this paragraph shall again apply to any proposed sale of Units and so on from time to time.

b.    <u>Drag-Along Rights</u>. If any third party who deals at arm's length with all Members (the "<u>Offeror</u>") has made an offer, proposed to be completed by way of asset or Unit acquisition, takeover bid, merger, amalgamation, statutory arrangement or any other business combination, that would result in a change of control of the Company or a transfer of all or substantially all of its assets with an offer price of at least $30,000,000.00 (a "<u>Substantial Offer</u>"), and Members holding a majority of the outstanding Units of the Company ("<u>Accepting Members</u>") have notified the other Members in writing that they will accept the Substantial Offer, then after compliance with Section 12a., Right of First Refusal, the Accepting Members may (but are not required to) give notice (the "<u>Selling</u> <u>Notice</u>") signed by all Accepting Members of such acceptance and the exercise of their rights hereunder to the Company and to each of the other Members and shall set out in the Selling Notice the name of the Offeror and the terms of the Substantial Offer. Following receipt of the Selling Notice, each Member shall be required to transfer all of its Units to the Offeror pursuant to the terms of the Substantial Offer and/or to vote or cause to be voted all of its Units to accomplish and give effect to the terms and conditions of the Substantial Offer in accordance with such Selling Notice, provided that the time specified for such transfer shall be at least sixty (60) days after the Selling Notice is given, and upon such terms as are contained in the Substantial Offer. Each Member hereby irrevocably appoints the Accepting Members as their lawful attorneys and agents, which appointment is coupled with an interest, with full power and authority to execute for and in the

- 7 -

name of and on behalf of the Member any deeds, transfers, conveyances, assignments, assurances, certificates and other documents and to do all things and acts which the Member is required to do hereunder in connection with a sale of the Units pursuant to this paragraph.

13.    Withdrawal of a Member.    Any Member may withdraw from the Company in accordance with the Act and upon approval of the other Members. Upon such withdrawal, the Member shall be entitled to receive the fair market valuation of their Percentage Interest at the time of such withdrawal, as determined by an independent third-party valuation paid for by the Company. This buyout amount shall be paid from the Company to the withdrawing Member over an agreed-upon period of time not to exceed five (5) years from the date of withdrawal. Separately, the death of a Member shall cause the Member's Percentage Interest in the Company to terminate (subject to the terms herein), and the proceeds from the Company's life insurance policy on such deceased Member will be used to buyout the deceased Member's Percentage Interest at the then-current fair market value. The deceased Member's estate shall receive such payout amount and retain a non-voting economic-only interest in future liquidation events of the Company in an amount to be determined by the remaining Members.

14.    Admission of Additional Members.    One or more additional members of the Company may be admitted to the Company from time to time by the unanimous consent of the Members.

15.    Member Removal.    Except for Kyle Kuchera, Noah Held, and Michael Burns, any future Member may be removed as a Member of the Company "For Cause" by a majority vote of the interests of the remaining Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Member engaging in any of the following: fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude. For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Member in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". Upon removal, the removed Member's interest in the Company shall be partially bought out, with the remaining Members having sole discretion over the valuation and payment terms. Additionally, the removed Member shall retain a non-voting equity interest of approximately five to ten percent in the Company (5-10%) (as determined by the Company at the time of removal), which shall entitle the removed Member to benefits from any future liquidity events of the Company.

16.    Indemnification.

a.    Indemnification Generally.    The Company shall indemnify, save harmless, and pay all judgments and claims against any Member, Manager, or employee ("Company Representative") relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Company Representative in connection with the Company's

- 8 -

business, provided that the Company Representative has given the Company written notification of the claim within ten (10) days of either service of process upon the Company Representative or the Company Representative's actual or constructive notice of the claim. Upon receipt of the Company Representative's written notification of the claim, the Company shall provide legal representation for the Company Representative in connection with the defense of any action based on any such act or omission. Notwithstanding any provision of this Operating Agreement, the Company will not indemnify, or the pay the expenses (including attorney's fees) of, any Company Representative:

(1)     In a suit or claim brought by the Company Representative, unless such person has acted in good faith and in a manner which he or she reasonably believed to be in, or not opposed to, the best interests of the Company;

(2)     In the case of a criminal proceeding, unless such Company Representative had no reasonable cause to believe that the conduct at issue was unlawful; or

(3)     To the extent that an Indemnified Representative of the Company has been successful on the merits or otherwise in defense of any proceeding or in defense of any claim, issue, or matter therein, such person shall be indemnified against expenses (including attorneys' fees and disbursements) actually and reasonably incurred by such person in connection therewith.

b.     Liability to the Company.  No Company Representative shall be liable, in damages or otherwise, to the Company or to any Member for any loss or liability that arises out of any act performed or omitted to be performed by such Company Representative pursuant to the authority granted by this Operating Agreement, other than any loss or liability that results from acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law.

c.     Contribution.  If the indemnification provided for in this Section or otherwise is unavailable for any reason in respect of any liability or portion thereof, the Company shall contribute to the liabilities to which the indemnified person may be subject in such proportion as is appropriate to reflect the intent of this Section or otherwise.

d.  Scope of this Section.  The rights granted by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification, contribution, or advancement of expenses may be entitled under any statute, agreement, or otherwise, both as to action in an indemnified capacity and as to action in any other capacity.  The indemnification, contribution, and advancement of expenses provided by or granted pursuant to this Section shall continue as to a Person who has ceased to be a Company Representative in respect of matters arising prior to such time, and shall inure to the benefit of the heirs, executors, administrators, and personal representatives of such a Person.

17.  Dissolution.  The Company shall be dissolved upon the unanimous written consent of the Members that it is no longer in the best interests of the Company to continue the business

- 9 -

of the Company, or upon the entry of an order of judicial dissolution under the Act. In the event of dissolution, the Members shall wind up the business of the Company in the following order of priority: (i) for payment of the Company's liabilities and obligations to its creditors (including creditors who are also Members), and the expenses of such dissolution, (ii) to the setting up of any reserves that the Members may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, and (iii) to the Members on a pro rata basis.

18. <u>Intellectual Property and Proprietary Rights</u>. Except for intellectual property that Kyle Kuchera is independently developing for the Company as of the date of this Operating Agreement (which he shall retain full rights to unless a separate agreement is entered into between Kyle Kuchera and the Company regarding such ownership), all intellectual property, proprietary information, and materials created by the Members for the Company and in connection with the Company shall belong to and be owned by the Company. The Members hereby assign and any all rights to such intellectual property to the Company perpetually, and agree that they will engage in good faith negotiations with respect to the future ownership of intellectual property being developed by Kyle Kuchera as of the date of this Operating Agreement (for which he may be granted an additional Percentage Interest in the Company not to exceed an additional 5%).

19. <u>Amendments</u>. This Operating Agreement may be amended from time to time by the unanimous written consent of the Members.

20. <u>Entire Agreement</u>. This Operating Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior agreement or understanding among the parties hereto with respect to the subject matter hereof.

21. <u>Governing Law and Dispute Resolution</u>. This Operating Agreement shall be governed by, and construed under, the laws of the State of New Mexico, all rights and remedies being governed by said laws. In the event of any dispute arising under this Operating Agreement, any such dispute which cannot be resolved directly among the Members within thirty (30) days shall be submitted to binding mediation, to be conducted by an independently appointed mediator. In this scenario, each Member agrees that it waives all claims it has or may have in civil court relating to such dispute, and agrees that the decision of the mediator would be in full settlement of such claims.

*[signature page follows]*

- 10 -

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Operating Agreement as of the date first written above.

Kyle Kuchera, Member

Kyle Kuchera

Noah Held, Member

Noah Held

Michael Burns, Member

Michael Burns

- 11 -

**SIGNALTAP LLC**

**COUNTERPART SIGNATURE PAGE
TO OPERATING AGREEMENT**

_____, 20__

The undersigned, desiring to become a member as of the date set forth above of SIGNALTAP LLC, a New Mexico limited liability company (the "Company"), hereby adopt and agree to be bound by all of the terms and provisions of, and shall be entitled to all of the benefits and privileges of, the Operating Agreement among the Company and the members of the Company (the "Operating Agreement"), and further authorize the Company to attach this signature page to the Operating Agreement in order to make the undersigned a party to the Operating Agreement.

_____
Name:
Address:

_____
_____

Acknowledged and Agreed as of
_____ ____, 20____

SIGNALTAP LLC

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

By: _____
   Name:
   Title:

- 12 -

**SCHEDULE A**

<u>Units</u>

| MEMBER NAME | NUMBER OF UNITS | PERCENTAGE INTEREST |
|---|---|---|
| Kyle Kuchera | 333.33 | 33.33% |
| Noah Held | 333.33 | 33.33% |
| Michael Burns | 333.33 | 33.33% |
| | | |
| | | |

*The contribution amount reflects the sum of all expenditures made by and the fair market value of property of the Members prior to the Company's formal organization in connection with establishing the Company and acquiring the assets necessary to operate the Company.

Note: Schedule A, as updated from time to time, shall be the complete record of Unit issuances and Percentage Interests, and all Members are deemed to have been issued the Units and Percentage Interests identified on Schedule A.

- 13 -

# Exhibit D

**REDSHIFT LLC**

*A Pennsylvania Limited Liability Company*

LLC Operating Agreement

**LIMITED LIABILITY COMPANY**
**OPERATING AGREEMENT OF**
**REDSHIFT LLC**

This Limited Liability Company Operating Agreement (this "Operating Agreement") of **RedShift LLC**, a Pennsylvania limited liability company (the "Company"), is entered into as of $\underline{July\ 30}$, 2025, by and among the Company and the signatories hereto (and such other persons who shall be admitted in the future as members of the Company in accordance with the terms hereof and shall have agreed to be bound hereby), each being sometimes referred to individually as a "Member" and collectively as the "Members."

W I T N E S S E T H :

WHEREAS, the Company was formed upon the filing of the Certificate of Organization (the "Certificate") with the Department of State of the Commonwealth of Pennsylvania on March 18, 2024; and

WHEREAS, the Members (defined below) wish to enter into this Operating Agreement to set forth their rights, obligations, and duties with respect to the Company.

NOW, THEREFORE, the Members hereby form a limited liability company pursuant to and in accordance with the Pennsylvania Limited Liability Company Law of 2016, as amended from time to time (the "Act"), and hereby agrees as follows:

1.    Name.  The name of the limited liability company formed hereby is:

**RedShift LLC**

2.    Term.  The term of the Company shall be perpetual unless dissolved in accordance with the Act.

3.    Purpose.  The primary purpose of the Company is to provide marketing services. Notwithstanding the foregoing, the Company may carry on any lawful business, purpose, or activity for which limited liability companies may be organized under the Act.  The Company shall at all times: (A) maintain its own separate books, records, and bank accounts; (B) hold itself out to the public and all other persons as a legal entity separate from its Members and any other person; (C) not commingle its assets with assets of any other person; (D) conduct its business in its own name and strictly comply with all organizational formalities to maintain its separate existence; (E) maintain separate financial statements; (F) pay its own liabilities only out of its own funds; (G) maintain an arm's length relationship with its affiliates and its Members; (H) pay the salaries of its own employees, if any; (I) not hold out its credit or assets as being available to satisfy the obligations of others; (J) allocate fairly and reasonably any overhead for shared office space; (K) use separate stationery, invoices, and checks; (L) not pledge its assets for the benefit of any other Person; (M) correct any known misunderstanding regarding its separate identity; (N)

- 1 -

maintain adequate capital in light of its contemplated business purpose, transactions, and liabilities; and (O) file its own tax returns, if any, and pay any taxes so required to be paid under applicable law to the extent that it is not (1) part of a consolidated group filing a consolidated return or returns, or (2) treated as a division or disregarded entity for tax purposes of another taxpayer; provided, however, that the failure of the Company, or the Members on behalf of the Company, to comply with any of the foregoing covenants or any other covenants contained in this Operating Agreement shall not affect the status of the Company as a separate legal entity. As used in this Operating Agreement, "Person" shall mean any real person or organized entity.

4. Members.

a. Members. The Company initially shall have one class of membership interest in the form of voting common units ("Units"). A person acquiring an ownership interest in the Company shall become a Member and be issued Units. Each Member's ownership Percentage Interest is the ratio of such Member's Units to all outstanding Units ("Percentage Interest"). A Person shall become a Member and be issued Units upon payment to the Company of any required capital contribution, which shall have appurtenant to it the right to one vote per Unit whenever Members are entitled to vote under the terms of this Operating Agreement. Unless otherwise stated, all Company decisions and resolutions require a majority vote of the interests of the Members. Upon execution of this Operating Agreement, each Member shall make the contribution set forth opposite such Member's name on Schedule A and shall receive the number of Units set forth thereon. Schedule A, as updated from time to time, shall be the complete record of Unit issuances in lieu of certificates and all Members are deemed to have been issued the Units identified on Schedule A. Presently, the Company has three Members, and the names and addresses of such Members are as follows:

| Name | Address |
|------|---------|
| Kyle Kuchera | 1919 Market St #2602 Philadelphia, PA 19103 |
| Noah Held | 1112 North Hancock Street #H331 Philadelphia, PA 19123 |
| Michael Burns | 9 Skyview Drive Ivyland, PA 18974 |

5. Office. The registered office of the Company shall be United States Corporation Agents, Inc., in Dauphin County. The Company may establish other places of business of the Company when and where required by or advisable to conduct the Company's business.

6. Management.

a. Management of the Company Generally. The business and affairs of the Company shall be managed by one or more managers ("Managers"). Unless authorized to do so

- 2 -

by this Operating Agreement or by Members, no attorney-in-fact, Member, employee, officer, or agent of the Company, other than the Members or a Manager, shall have any power or authority to bind the Company in any way, to pledge its credit, or to render it liable pecuniarily for any purpose. Except for situations in which the approval of the Members is expressly required by this Operating Agreement or by non-waivable provision of the Act, the Managers shall have full and complete authority, power, and discretion to direct, manage, and control the business, affairs, and properties of the Company; to make all decisions regarding those matters; and to perform any and all other acts or activities customary or incident to the daily management of the Company's business, including but not limited to entering into contractual relationships on behalf of the Company up to $5,000.00 per commitment.

    b.  <u>Qualifications</u>. Each Manager of the Company shall be a natural person of full age who need not be a resident of the Commonwealth of Pennsylvania.

    c.  <u>Number, Selection, and Term of Office</u>.

     (1)  Managers shall be appointed from time to time by the Members. Initially, the Managers shall be Kyle Kuchera, Noah Held, and Michael Burns. There is no maximum on the number of Managers the Company may have. Kyle Kuchera shall be primarily responsible for sales and technology responsibilities, Noah will shall be primarily responsible for sales and operations responsibilities, and Michael Burns shall be primarily responsible for marketing and finance responsibilities.

     (2)  Each Manager shall hold office until a successor has been selected and qualified by the Members or until his or her earlier death, resignation in accordance with 6(k) of this Operating Agreement, or removal by the Members in accordance with 6(l) of this Operating Agreement.

    d.  <u>Managers' Meetings</u>. Meetings of the Managers shall be held at such time and place within or outside of the Commonwealth of Pennsylvania as shall be designated from time to time by resolution of the Managers.

    e.  <u>Manner of Acting</u>. Whenever any Company action is to be taken by a vote of the Managers of the Company, it shall be authorized upon receiving the concurrence of any one Manager. Any action of the Managers which may be taken at a meeting of the Managers may be taken by written consent upon the execution of such consent by any one Manager, acting singly. Where a vote has been taken by the Managers, in the case that multiple Managers exist and the Members are not the Managers, whenever there is a tie vote, the Members shall cast the determinative vote. If the Members are the Managers, the Members may unilaterally authorize any actions of the Company.

    f.  <u>Limitation of Managers' Authority</u>.

- 3 -

(1) Notwithstanding the powers and authorities described in Section 6(a) above, unless prior written approval has been given by the Members, the Managers shall not be authorized:

(i) To sign contracts or enter into agreements on behalf of the Company in excess of $5,000.00;

(ii) To apply for loans on behalf of the Company in excess of $5,000.00;

(iii) To employ accountants, legal counsel, managing agents, or other experts or consultants to perform services for the Company or to compensate them from Company funds in excess of $5,000.00;

(iv) To purchase, hold, sell, exchange, transfer, or otherwise acquire or dispose of real or personal property, whether tangible or intangible, held by the Company in excess of $5,000.00;

(v) To open and close bank accounts on behalf of the Company;

(vi) To make withdrawals from Company funds;

(vii) To terminate contracts between the Company and customers, clients, vendors, or any other party in agreement with the Company;

(viii) To purchase liability or other insurance on behalf of the Company's property or business in excess of $5,000.00;

(ix) To execute on behalf of the Company any other instruments or documents, including checks, drafts, notes, or other negotiable instruments; mortgages or deeds of trust, security agreements, financing statements, documents providing for the acquisition, mortgage, or disposition of the Company's property; assignments, bills of sale, leases, partnership agreements; or operating agreements of other limited liability companies in excess of $5,000.00; or

(x) To dissolve the Company except as otherwise provided in Section 17 below.

- 4 -

g.    Reliance by Third Parties. Persons dealing with the Company are entitled to rely conclusively upon a certificate of the Managers to the effect that they are then acting as the Managers and upon the power of the Managers as herein set forth.

h.    Liability for Certain Acts. The Managers shall perform their managerial duties in good faith, in a manner reasonably believed to be in the best interests of the Company, and with such care and business judgment as an ordinarily prudent person in a like position would use under similar circumstances, including the reliance in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by the Managers, Members, officers, employees, or committees of the Company or by any other person, as to matters the Managers reasonably believe are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company. The Managers do not, in any way, guarantee the return of the Members' capital contributions or a profit for the Members from the operations of the Company. The Managers who so perform the duties of the Managers shall not be personally liable to the Company or to any Member for any loss or damage sustained by the Company or any Member, unless (i) the Manager has breached or failed to perform the duties of its position under the Act or this Operating Agreement; and (ii) the breach or failure to perform constitutes self-dealing, willful misconduct, or recklessness by the Manager. Nothing in this paragraph shall apply to the liability of a Manager pursuant to any criminal statute, or for the payment of taxes pursuant to federal, state, or local law.

i.    Reliance on Reports and Information by Member or Manager. A Member or Manager of the Company shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports, or statements presented to the Company by any of its other Managers, Members, officers, employees, or committees of the Company, or by any other person, as to matters the Member or Manager reasonably believes are within such other person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports, or statements as to the value and amount of the assets, liabilities, profits, or losses of the Company or any other facts pertinent to the existence and amount of assets from which distributions to the Members might properly be paid.

j.    Bank Accounts. Unless requested in writing by the Members, the Managers shall not be authorized to open bank accounts in the name of the Company. The Members shall be the sole signatories on any bank accounts opened in the name of the Company.

k.    Resignation. A Manager of the Company may resign at any time by giving written notice to the Company. The resignation of a Manager shall be effective upon receipt of such notice or at such later time as shall be specified in the notice. Unless otherwise specified in the notice, the acceptance of the resignation shall not be necessary to make such resignation effective. The resignation of a Manager who is also a Member shall not automatically constitute the withdrawal of the Manager's rights as a Member.

- 5 -

l.    Removal of Managers. Any Manager may be removed from office "For Cause" by a majority vote of the Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Manager engaging in any of the following: fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude. For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Manager in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". The removal of a Manager "For Cause" who is also a Member shall not automatically constitute the removal of the Member.

m.    Vacancies. In the event of any vacancy with respect to a Manager occurring for any reason, the Members shall appoint an interim Manager until the vacancy is filled.

n.    Compensation. Without the approval of the Members, the Managers will not be entitled to compensation for their services as Managers. The Company shall, however, reimburse the Managers for their reasonable expenses incurred in connection with their services to the Company.

7.    Capital Contributions. The Members have contributed to the Company an amount of money and the fair market value of property as their initial capital contributions, in exchange for which they have each received 333.33 Units, representing a 33.33% Percentage Interest each in the Company.

8.    Additional Contributions. Members shall not be required to make additional capital contributions to the Company.

9.    Allocation of Profits and Losses. The Company's profits and losses shall be allocated first to restore any net loss of the Company, and then to the Members in accordance with the Members' Percentage Interests. The Members intend that the Company be disregarded as an entity separate from its owners for U.S. tax purposes.

10.    Distributions. Distributions shall be made to the Members at the times and in the aggregate amounts as determined by the Members. The Members may first provide for any reserves that are deemed appropriate before allocating distributions to the Members. The Company will issue monthly distributions to Kyle Kuchera, Noah Held, and Michael Burns in the amount of $20,000.00 each, and no actions shall be taken by the Company or the Members which will affect these monthly distribution amounts. If there are insufficient funds on a monthly basis to issue such distributions, the Members agree to first meet in an effort to resolve the issue before any such amounts are adjusted.

11.    Best Efforts. Each Member shall have the devote their time and best efforts as reasonably necessary to fulfill their respective duties to the Company, and perform such duties in

good faith. The Members acknowledge and agree that continued failure to exercise such duties and devote such time without such failure being cured within thirty (30) days of notice of such may constitute grounds for removal of a Member, consistent with the terms of this Operating Agreement.

      12.   Transfers.

           a.   Right of First Refusal. If at any time any of the Members (for purposes of this paragraph "Selling Member") desires to sell to a third party ("Buyer") some or all of the Units ("Offered Units") of such Selling Member, such Selling Member shall obtain from such Buyer a bona fide written offer ("Offer") which the Selling Member is ready and willing to accept in good faith, to purchase the Offered Units and shall give notice in writing to all other Members of the receipt of the Offer together with a copy thereof, and the other Members (for purposes of this paragraph the "Offeree Members") shall have the right, exercisable by written notice given to the Selling Member within sixty (60) days after the giving of the notice by the Selling Member, to purchase, at a price equal to the Offer price, any or all of the Offered Units. The right of any Offeree Member to purchase the Offered Units shall be in proportion to its holdings of all Units held by all Offeree Members, provided that Offeree Members may oversubscribe for Offered Units and shall be entitled to acquire additional Offered Units, in proportion to their holdings of all Units held by all other oversubscribing Members, to the extent that Offered Units remain unallocated after all Offeree Members have responded to, or have been deemed to waive, the Offer. If the Offeree Members exercise such rights in whole or part, the purchase and sale of the Offered Units taken up by the Offeree Members shall be completed within thirty (30) days of the date on which the Offeree Members give notice to the Selling Member of their intention to exercise this right. If the Offeree Members do not exercise such right in respect of all of the Offered Units, then the Selling Member may accept the Offer and some or all of the remaining unsubscribed Offered Units in accordance with the provisions of the Offer during the further period of thirty (30) days after the expiration of the period of thirty (30) days during which the Offeree Members could have exercised this right. If no such sale is completed within such further period of thirty (30) days, the provisions of this paragraph shall again apply to any proposed sale of Units and so on from time to time.

           b.   Drag-Along Rights. If any third party who deals at arm's length with all Members (the "Offeror") has made an offer, proposed to be completed by way of asset or Unit acquisition, takeover bid, merger, amalgamation, statutory arrangement or any other business combination, that would result in a change of control of the Company or a transfer of all or substantially all of its assets with an offer price of at least $30,000,000.00 (a "Substantial Offer"), and Members holding a majority of the outstanding Units of the Company ("Accepting Members") have notified the other Members in writing that they will accept the Substantial Offer, then after compliance with Section 12a., Right of First Refusal, the Accepting Members may (but are not required to) give notice (the "Selling Notice") signed by all Accepting Members of such acceptance and the exercise of their rights hereunder to the Company and to each of the other Members and shall set out in the Selling Notice the name of the Offeror and the terms of the Substantial Offer. Following receipt of the Selling Notice, each Member shall be required to transfer all of its Units to the Offeror pursuant to the terms of the Substantial Offer and/or to vote or cause to be voted all of its Units to accomplish and give effect to the

- 7 -

terms and conditions of the Substantial Offer in accordance with such Selling Notice, provided that the time specified for such transfer shall be at least sixty (60) days after the Selling Notice is given, and upon such terms as are contained in the Substantial Offer. Each Member hereby irrevocably appoints the Accepting Members as their lawful attorneys and agents, which appointment is coupled with an interest, with full power and authority to execute for and in the name of and on behalf of the Member any deeds, transfers, conveyances, assignments, assurances, certificates and other documents and to do all things and acts which the Member is required to do hereunder in connection with a sale of the Units pursuant to this paragraph.

13.    Withdrawal of a Member.  Any Member may withdraw from the Company in accordance with the Act and upon approval of the other Members. Upon such withdrawal, the Member shall be entitled to receive the fair market valuation of their Percentage Interest at the time of such withdrawal, as determined by an independent third-party valuation paid for by the Company. This buyout amount shall be paid from the Company to the withdrawing Member over an agreed-upon period of time not to exceed five (5) years from the date of withdrawal. Separately, the death of a Member shall cause the Member's Percentage Interest in the Company to terminate (subject to the terms herein), and the proceeds from the Company's life insurance policy on such deceased Member will be used to buyout the deceased Member's Percentage Interest at the then-current fair market value. The deceased Member's estate shall receive such payout amount and retain a non-voting economic-only interest in future liquidation events of the Company in an amount to be determined by the remaining Members.

14.    Admission of Additional Members.  One or more additional members of the Company may be admitted to the Company from time to time by the unanimous consent of the Members.

15.    Member Removal.  Except for Kyle Kuchera, Noah Held, and Michael Burns, any future Member may be removed as a Member of the Company "For Cause" by a majority vote of the interests of the remaining Members and upon at least thirty (30) days written notice of such removal. Removal "For Cause" includes a Member engaging in any of the following: fraud, embezzlement, or theft of Company property; willful misconduct resulting in damages to the Company; any unauthorized disclosure of the Company's trade secrets or confidential information; or being charged with a felony or a misdemeanor involving moral turpitude. For purposes of this Section, an act or failure to act shall not be deemed willful or intentional, as those terms are used herein, unless it is done or omitted to be done by the Member in bad faith and without a reasonable belief that the action or omission was in the best interest of the Company. Failure to meet performance standards or objectives, by itself, does not constitute removal "For Cause". Upon removal, the removed Member's interest in the Company shall be partially bought out, with the remaining Members having sole discretion over the valuation and payment terms. Additionally, the removed Member shall retain a non-voting equity interest of approximately five to ten percent in the Company (5-10%) (as determined by the Company at the time of removal), which shall entitle the removed Member to benefits from any future liquidity events of the Company.

16.    Indemnification.

- 8 -

a. <u>Indemnification Generally</u>. The Company shall indemnify, save harmless, and pay all judgments and claims against any Member, Manager, or employee ("<u>Company Representative</u>") relating to any liability or damage incurred by reason of any act performed or omitted to be performed by the Company Representative in connection with the Company's business, provided that the Company Representative has given the Company written notification of the claim within ten (10) days of either service of process upon the Company Representative or the Company Representative's actual or constructive notice of the claim. Upon receipt of the Company Representative's written notification of the claim, the Company shall provide legal representation for the Company Representative in connection with the defense of any action based on any such act or omission. Notwithstanding any provision of this Operating Agreement, the Company will not indemnify, or the pay the expenses (including attorney's fees) of, any Company Representative:

(1)     In a suit or claim brought by the Company Representative, unless such person has acted in good faith and in a manner which he or she reasonably believed to be in, or not opposed to, the best interests of the Company;

(2)     In the case of a criminal proceeding, unless such Company Representative had no reasonable cause to believe that the conduct at issue was unlawful; or

(3)     To the extent that an Indemnified Representative of the Company has been successful on the merits or otherwise in defense of any proceeding or in defense of any claim, issue, or matter therein, such person shall be indemnified against expenses (including attorneys' fees and disbursements) actually and reasonably incurred by such person in connection therewith.

b. <u>Liability to the Company</u>. No Company Representative shall be liable, in damages or otherwise, to the Company or to any Member for any loss or liability that arises out of any act performed or omitted to be performed by such Company Representative pursuant to the authority granted by this Operating Agreement, other than any loss or liability that results from acts or omissions not in good faith or which involve intentional misconduct or a knowing violation of law.

c. <u>Contribution</u>. If the indemnification provided for in this Section or otherwise is unavailable for any reason in respect of any liability or portion thereof, the Company shall contribute to the liabilities to which the indemnified person may be subject in such proportion as is appropriate to reflect the intent of this Section or otherwise.

d. <u>Scope of this Section</u>. The rights granted by this Section shall not be deemed exclusive of any other rights to which those seeking indemnification, contribution, or advancement of expenses may be entitled under any statute, agreement, or otherwise, both as to action in an indemnified capacity and as to action in any other capacity. The indemnification, contribution, and advancement of expenses provided by or granted pursuant to this Section shall continue as to a Person who has ceased to be a Company Representative in respect of matters arising prior to

- 9 -

such time, and shall inure to the benefit of the heirs, executors, administrators, and personal representatives of such a Person.

17.    Dissolution.  The Company shall be dissolved upon the unanimous written consent of the Members that it is no longer in the best interests of the Company to continue the business of the Company, or upon the entry of an order of judicial dissolution under the Act.  In the event of dissolution, the Members shall wind up the business of the Company in the following order of priority: (i) for payment of the Company's liabilities and obligations to its creditors (including creditors who are also Members), and the expenses of such dissolution, (ii) to the setting up of any reserves that the Members may deem reasonably necessary for any contingent or unforeseen liabilities or obligations of the Company, and (iii) to the Members on a pro rata basis.

18.    Intellectual Property and Proprietary Rights.  Except for intellectual property that Kyle Kuchera is independently developing for the Company as of the date of this Operating Agreement (which he shall retain full rights to unless a separate agreement is entered into between Kyle Kuchera and the Company regarding such ownership), all intellectual property, proprietary information, and materials created by the Members for the Company and in connection with the Company shall belong to and be owned by the Company. The Members hereby assign and any all rights to such intellectual property to the Company perpetually, and agree that they will engage in good faith negotiations with respect to the future ownership of intellectual property being developed by Kyle Kuchera as of the date of this Operating Agreement (for which he may be granted an additional Percentage Interest in the Company not to exceed an additional 5%).

19.    Amendments.  This Operating Agreement may be amended from time to time by the unanimous written consent of the Members.

20.    Entire Agreement.  This Operating Agreement constitutes the entire agreement among the parties hereto with respect to the subject matter hereof, and supersedes any prior agreement or understanding among the parties hereto with respect to the subject matter hereof.

21.    Governing Law and Dispute Resolution.  This Operating Agreement shall be governed by, and construed under, the laws of the Commonwealth of Pennsylvania, all rights and remedies being governed by said laws. In the event of any dispute arising under this Operating Agreement, any such dispute which cannot be resolved directly among the Members within thirty (30) days shall be submitted to binding mediation, to be conducted by an independently appointed mediator. In this scenario, each Member agrees that it waives all claims it has or may have in civil court relating to such dispute, and agrees that the decision of the mediator would be in full settlement of such claims.

*[signature page follows]*

- 10 -

IN WITNESS WHEREOF, the undersigned, intending to be legally bound hereby, have duly executed this Limited Liability Company Operating Agreement as of the date first written above.

Kyle Kuchera, Member

Kyle Kuchera

Noah Held, Member

Noah Held

Michael Burns, Member

Michael Burns

- 11 -

**REDSHIFT LLC**

**COUNTERPART SIGNATURE PAGE
TO OPERATING AGREEMENT**

_____, 20__

      The undersigned, desiring to become a member as of the date set forth above of REDSHIFT LLC, a Pennsylvania limited liability company (the "Company"), hereby adopt and agree to be bound by all of the terms and provisions of, and shall be entitled to all of the benefits and privileges of, the Operating Agreement among the Company and the members of the Company (the "Operating Agreement"), and further authorize the Company to attach this signature page to the Operating Agreement in order to make the undersigned a party to the Operating Agreement.

_____

Name:
Address:

_____
_____
_____

Acknowledged and Agreed as of
_____ ____, 20____

REDSHIFT LLC

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

- 12 -

**SCHEDULE A**

Units

| MEMBER NAME | NUMBER OF UNITS | PERCENTAGE INTEREST |
|---|---|---|
| Kyle Kuchera | 333.33 | 33.33% |
| Noah Held | 333.33 | 33.33% |
| Michael Burns | 333.33 | 33.33% |
| | | |
| | | |

*The contribution amount reflects the sum of all expenditures made by and the fair market value of property of the Members prior to the Company's formal organization in connection with establishing the Company and acquiring the assets necessary to operate the Company.

Note: Schedule A, as updated from time to time, shall be the complete record of Unit issuances and Percentage Interests, and all Members are deemed to have been issued the Units and Percentage Interests identified on Schedule A.

- 13 -